[No. S018815. July 22, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
RAYMOND ANTHONY GURULE, Defendant and Appellant.

## COUNSEL

Violet Elizabeth Grayson, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Catherine A. Rivlin and Jeffrey M. Bryant, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WERDEGAR, J.**—Raymond Anthony Gurule was convicted in 1989 in San Mateo County Superior Court of the first degree murder of Elliott Dolinka. (Pen. Code, § 187; all further statutory references are to this code unless otherwise indicated.) The jury also sustained special circumstance allegations that defendant had previously been convicted of murder (§ 190.2, subd. (a)(2)) and that the murder had occurred during the commission of a robbery (§ 190.2, former subd. (a)(17)(i), now redesignated subd. (a)(17)(A)). The

initial jury deadlocked on the issue of penalty, and the trial court declared a mistrial. A second jury was empanelled. On October 18, 1990, the second jury set the penalty at death under the 1978 death penalty law. (§ 190.1 et seq.) This appeal is automatic. (§ 1239, subd. (b).)

After considering the claims raised on appeal, we affirm the judgment in its entirety.

## I. GUILT PHASE

### A. *Facts*

#### 1. *The Murder*

Barry Van Otten owned Barry's Chevron, a service station in Daly City. He employed 15-year-old Elliott Dolinka as a part-time employee. On Saturday, May 15, 1982, Van Otten opened his station at 7:00 a.m., placing about $55 in the cash box from the safe in the office. Van Otten had the only key to the safe. Dolinka arrived for work around 7:30 in the morning. Van Otten left shortly thereafter to obtain some auto parts.

About 8:25 a.m., George Burton and Stan Moore drove into the station for gas. Burton noticed an Oldsmobile Cutlass parked at the station. Shirley Funk also drove into the station for gas at that time and recalled seeing Moore's Cadillac and a light-colored, older American car. Dolinka, wearing his Chevron uniform, pumped gas for both Funk's car and Moore's Cadillac. A young African-American man (Mark Garrison) paced around the station and also helped pump gas for customers, although he was not wearing a Chevron uniform. One customer, David McLaughlin, asked Dolinka if the young African-American man was a friend of his. Dolinka replied, "I don't know who he is."

Around this time, another young man (defendant) came to the station and spoke with the African-American man. The second man was neither White nor Black, but possibly Asian or Hispanic.[1]

Van Otten called in around 8:35 a.m., and Dolinka reported everything was fine. He said two people in a Cutlass had come in, needing auto repairs. Van Otten said to write up a work order and tell them he would be back at 10:00 a.m. to work on their car.

Charles Arivett owned the Shell service station across the street from Barry's Chevron. About 8:45 in the morning, Arivett heard someone making

---

[1]Defendant's father was apparently Hispanic; his mother was a Native American.

gurgling and choking sounds and emerged from his office to see Dolinka, bleeding profusely from his throat. Dolinka, whom Arivett identified from his Chevron uniform, was trying to speak but could only manage some gurgling sounds. Arivett told one of his employees, Reginald Ram, to call 911. Arivett and his employees tried to stop the bleeding with some rags. Arivett then armed himself and went to the Chevron station, but found no one around.

Police responded and found blood splatters and a pool of blood at Barry's Chevron. Everything else was tidy; there was no sign of a struggle. It was later determined that about $73 had been taken from the cash box. No identifiable fingerprints were found at the crime scene.

Despite Arivett's assistance, Dolinka died from a loss of blood. An autopsy revealed his neck had been cut almost to his neck vertebrae with a sharp knife, severing the carotid artery, jugular vein and esophagus. Dolinka would have sucked in blood when he tried to breathe, making it difficult to speak. His survival time would have been between one and five minutes. He bore no defensive wounds.

Despite pursuing literally hundreds of leads, including obtaining a list of several thousand registered owners of 1967 to 1969 model Oldsmobile Cutlasses who lived in the Bay Area, police had no suspects for the crime from the date of its commission in May 1982 until November 1987. Then, on November 4, 1987, there was a break in the case. On that date, Mark Garrison called Daly City police from Grand Prairie, Texas. Garrison told Sergeant George Quinn that he had been in the Bay Area in 1981 and 1982, that he had participated in a robbery in Daly City in which the victim was killed by slashing his throat, and that about $75 was taken. Garrison told Quinn he had a 1967 Oldsmobile Cutlass.[2] Sergeant Quinn verified part of the story, finding the car was registered in Texas but had been issued several parking tickets in Oakland.

Sergeant Quinn and Detective Donald McCarthy flew to Texas to interview Garrison at his home. Garrison waived his *Miranda*[3] rights and recounted his participation in Dolinka's murder. He described his crime partner as well. Garrison exhibited no hesitancy in confessing his guilt to the police. Quinn and McCarthy obtained an arrest warrant. Garrison waived extradition and accompanied the officers back to California.

---

[2] Quinn later testified that Garrison told him the Cutlass was a 1971 model.

[3] *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974] (*Miranda*).

Once back in California, the officers drove around with Garrison. Garrison pointed out the location of Barry's Chevron, which by that time was just a vacant lot, the station having been demolished in the intervening years. They looked for the location where Garrison said he had thrown the knife after fleeing the crime scene. He could not remember the exact location and provided some possible places, but a thorough search of those locations failed to locate a knife.

The officers and Garrison crossed the Bay Bridge into Oakland and, following Garrison's directions, drove to 30th Street and San Pablo Avenue, where he said an auto body shop once stood. He said he had brought his car to the shop after having suffered an accident. Police later verified an auto body shop was once at that location, as Garrison had described.

It was at that auto body shop that Garrison reported having met a man he knew only as "Apache." Garrison explained that "Apache" assisted him in the robbery and murder of Dolinka. Garrison described "Apache" as having the name "Apache" tattooed on his arm, and as having come from Los Angeles. With this information, police identified defendant Gurule as the man Garrison knew as "Apache."

Garrison directed the officers to his former residence, an apartment house in the 600 block of 30th Street in Oakland. He then tried to find defendant's residence, settling on one house in which he thought "Apache" may have lived, although he was not sure. Police later verified defendant had lived in a house just four blocks away.

## 2. *Garrison's Testimony*

Garrison testified for the People. He said he came to California from Texas as part of the United States Army Reserve in 1982 or 1983. At the time, he drove a 1970 or 1971 Oldsmobile Cutlass Supreme, brown with a white top. (Police confirmed Garrison had a 1971 tan Oldsmobile Cutlass Supreme with a white roof.) He got into a car accident and took his car to a body shop. There he met a man with a tattoo on his arm that said "Apache." Garrison called the young man "Apache" and did not know his real name.

Garrison told "Apache" he was short of money and was thinking of committing a robbery to obtain enough money to return to Texas. The two agreed jointly to commit a robbery. Garrison explained to "Apache" that he had never been in trouble before so he thought it best to kill the victim to facilitate their escape, although if it was left to him, he would not kill the victim. According to Garrison, "Apache" replied, "Okay, it won't be no

problem, I'll do it." "Apache" indicated he had killed before and was ready to kill again. Lacking funds to buy a firearm, they decided to buy a knife. They eventually purchased a fish knife from a local Sears store in Oakland.

Garrison testified that a few days before the murder, he had been driving around Daly City looking for a job when he stopped at a service station to use the men's room. He saw an employee putting money in a safe and got the idea to rob the station. The day of the murder, Garrison and "Apache" drove to Daly City and parked across the street from the service station. The plan was for "Apache" to hold the attendant while Garrison opened the safe. They waited for about two hours, but eventually abandoned the plan because the station was too busy.

Now improvising, the pair drove up the hill and saw another service station that looked promising because it had only one attendant. They stopped and may have had the attendant wash their windows. After leaving, Garrison and "Apache" agreed that Garrison should return alone and pretend something was wrong with his car. In accordance with the plan, Garrison dropped "Apache" off and returned, pulling his car into one of the service bays. He had the attendant check his oil and engaged him in conversation.

At some point, Garrison and the victim were standing around the car with the hood up when "Apache" entered the service bay. Garrison testified he nodded to "Apache," who then grabbed the attendant by the neck. "Apache" had the knife because, according to Garrison, "I wasn't going to do a murder. I wasn't going to kill anyone." While "Apache" was holding the attendant, Garrison asked where the money was. The attendant replied there was a safe and a cash register in the front office. (Garrison later contradicted himself, saying the attendant said there was no safe.) Garrison went and retrieved the money from the register. Returning to "Apache," Garrison told him: "Come on, it's time to go," and "Go ahead and do it."

"Apache" told Garrison to hold the attendant's feet. Garrison put his feet on the victim's ankles but then backed off, wanting no part in the murder. Garrison heard a gurgling sound and got in the car. "Apache" joined him, and Garrison noticed he had blood on his shirt. The attendant ran out the door, and Garrison noticed the attendant had what looked like a circle around his neck. He admitted, though, that he did not see "Apache" actually cut the victim. Garrison drove out of the service station, on to the freeway, and back to Oakland. On the way, he threw the knife out the window.

Once back in Oakland, the pair split the money. "Apache" left, and Garrison never saw him again. Garrison then washed his car because there

was blood on the outside. The next day he called his father in Texas, who sent Garrison some money, and Garrison drove back to Texas. He returned sometime thereafter to find out if the victim had died. Learning that the victim had died led Garrison eventually to contact the Daly City police and turn himself in. Asked if he saw the man he knew as "Apache" in court that day, Garrison replied: "I don't think so. As I remember."

### 3. Defendant's Story

Sergeant Quinn testified and recounted defendant's description of the crimes, made during a police interrogation. Defendant initially denied knowing Garrison, but after continued questioning, eventually admitted to having met Garrison in the body shop and to having discussed committing a robbery with him. The pair drove around Oakland and San Leandro looking for a place to rob. None were satisfactory so they went to San Francisco, identified a few possible places, and agreed to return the next day. Defendant confirmed that he and Garrison then purchased a knife at Sears. Defendant thought the knife was too big for his hand so he gave it to Garrison.

They returned to the San Francisco area, settling on Barry's Chevron as their target. According to defendant's recollection, the crime unfolded much as Garrison had described, with some significant exceptions. For example, according to defendant, he obtained a white canvas bag of money from the safe while Garrison held the attendant, and—more importantly—it was Garrison who was in charge and who wielded the knife. After getting the money, defendant said he jumped into the car. At that point, Garrison asked, "What am I going to do?" Defendant told him to leave the victim and "Let's go." Garrison then turned to the attendant and asked, "Are you going to tell anybody?" The victim replied in the negative.

According to defendant, Garrison then told him to "wait a minute" and ran back to the office. Defendant then heard Garrison yell to get a rag. The two men took the attendant to a storage area in the rear of the station. Defendant asked why Garrison needed a rag, and Garrison said, "I'm afraid he's going to tell." Defendant threw him a rag, then went back and started the car. He heard the attendant say, "Take whatever you want, just don't hurt me." Thereafter Garrison ran to the car, and the pair made their getaway. Defendant asked what Garrison had done to the attendant, and Garrison stated, "I stuck him." Defendant did not think much about it because, as they drove away, he saw the attendant standing in the doorway and there was nothing unusual about him.

## B. *Pretrial Issues*

### 1. *Discovery of Garrison's Psychiatric Records*

The primary witness against defendant was Mark Garrison. Defendant contends the trial court's failure to grant him access to Garrison's psychiatric records in order to impeach him at trial violated several of defendant's constitutional rights.

#### a. *Facts*

After Garrison contacted the police and volunteered information inculpating himself in the then unsolved 1982 robbery and murder at Barry's Chevron, Attorney Peter Goldscheider was assigned to represent Garrison. Garrison's apparent mental instability led the trial court to appoint Dr. Alfred Fricke, a clinical psychologist, to examine Garrison and determine whether he was competent to stand trial. In a report dated January 31, 1988, Dr. Fricke found Garrison in the throes of a "psychotic decompensation" and thus incompetent to stand trial. Another appointed expert, Dr. Paul Koller, came to the same conclusion.

Garrison was later sent to Chope Hospital for treatment after suffering injuries when another inmate attacked him. On his return to the county jail, Garrison was examined by Dr. George Wilkinson, a psychiatrist associated with Forensic Mental Health Services, a division of the county mental health system that provided mental health services for inmates housed at the San Mateo County jail.

Dr. Fricke reevaluated Garrison a few months later and concluded that, with the intervening treatment and medication, Garrison was now sane and competent to stand trial. Garrison then entered into a plea bargain in which he pleaded guilty to first degree murder, was sentenced to a term of 30 years to life in prison, and agreed to testify against defendant.

Prior to trial, defendant sought discovery of the records of Dr. Fricke, Dr. Wilkinson and Chope Hospital, generally seeking "[a]ll charts, test results, documents, records, memoranda, reports, etc., however recorded, which materials advert to, relate to, pertain to, reflect upon, and otherwise describe the psychiatric and emotional condition of Mark Anthony Garrison." Garrison, through his attorney, Goldscheider, opposed disclosure of the records, claiming they were privileged under the psychotherapist-patient privilege. (Evid. Code, § 1014.) In addition, Goldscheider informed the court that because he had hired both Dr. Fricke and Dr. Wilkinson as defense experts,

any documents supporting their diagnoses were also privileged under the attorney-client privilege. (*Id.*, § 954.) The trial judge took the matter under submission.

At a later hearing, Goldscheider formally objected to disclosure of the Chope Hospital records on grounds of psychotherapist-patient privilege, and to disclosure of any records involving Dr. Fricke on both psychotherapist-patient and attorney-client privilege grounds, as well as on grounds of work product. The trial court announced that defendant, through his counsel's declaration in support of the subpoena, had established good cause, and it accordingly would examine in camera Garrison's psychiatric records held by the Peninsula Psychiatric Associates (with whom Dr. Fricke was associated) and Chope Hospital. Goldscheider strenuously objected, claiming there was no authority permitting the court to examine material privileged under the attorney-client privilege, even in camera.

When the trial court commented that a point in favor of disclosure was that Garrison's case was already final, Goldscheider disagreed, explaining that Garrison's plea bargain permitted the People to reopen the case if new evidence of his guilt developed. The prosecutor confirmed that Garrison's plea bargain "contain[s] a specific condition that if independent evidence is developed showing [he is] the actual killer . . . that plea could be set aside and both sides return to the status quo [ante]." The prosecutor, however, asserted that the district attorney's office was prepared to offer use immunity to Garrison, promising not to use information contained in the challenged psychiatric records to reopen Garrison's case or otherwise subject him to further prosecution. The matter was continued at Goldscheider's request to permit him to do further research.

The trial court returned to the issue on August 14, 1989. As to the records of Dr. Fricke and Dr. Wilkinson, the court found they were covered by the attorney-client privilege. Rejecting defendant's contention his Sixth and Eighth Amendment rights justified examining the Fricke and Wilkinson records in camera, the trial court held no in camera examination of such records was authorized. The court explained that defendant would have an adequate opportunity to impeach Garrison by exploring the terms of Garrison's plea bargain. As to the records from Chope Hospital, where Garrison had been sent for treatment following an inmate's assault, the court found those records were covered only by the psychotherapist-patient privilege, not by the attorney-client privilege. The trial court informed the parties that it accordingly had examined the Chope Hospital records in camera, but had found no disclosable evidence.

Defendant argued that even though Goldscheider had hired Dr. Fricke and Dr. Wilkinson, thereby implicating the attorney-client privilege, the two

doctors had examined Garrison by court appointment pursuant to sections 1367 and 1368 to determine Garrison's competence to stand trial. As a result, he argued, any records produced in conjunction with that appointment could not be privileged. After hearing further argument, the court agreed that any work done by Dr. Fricke pursuant to court appointment and preceding his employment by Goldscheider also was potentially disclosable.

Whether Dr. Wilkinson had examined Garrison pursuant to a section 1367/1368 appointment was unclear. Although there was some dispute, the court determined that Dr. Wilkinson had been hired by Goldscheider as a defense expert for Garrison in November 1987, that Dr. Wilkinson had examined Garrison in January 1988 "in his capacity as a psychiatrist with San Mateo County Forensic Mental Health Services," and that he had never examined Garrison prior to being retained by Goldscheider. In addition, the trial court had appointed Dr. Wilkinson (at Goldscheider's request) to examine Garrison for competency pursuant to sections 1367 and 1368.

At a later hearing, Douglas Gray, an attorney in court representing Goldscheider, Dr. Fricke and Dr. Wilkinson, conceded that any psychiatric work undertaken pursuant to sections 1367 and 1368 would not be privileged. Gray stated his belief that Dr. Wilkinson had never examined Garrison pursuant to court appointment under sections 1367 and 1368, but that he may have examined Garrison in his capacity as the psychiatrist on call for Forensic Mental Health Services. This examination might have occurred sometime after Dr. Wilkinson was hired by Goldscheider. The trial court expressed a tentative view that any material flowing from Dr. Wilkinson's contact with Garrison in Wilkinson's capacity as a representative of Forensic Mental Health Services would fall outside the attorney-client privilege, but would be within the psychotherapist-patient privilege. Defendant unsuccessfully sought review of the trial court's decision in the Court of Appeal.

Defense counsel later urged the trial court to review its earlier decision finding no disclosable evidence in Garrison's Chope Hospital records. The trial court agreed and released a few pages that indicated a nurse had noted that Garrison's memory, insight and judgment seemed impaired.

The next day, Gray appeared and represented that he had combed through Dr. Fricke's notes and reports and segregated those materials associated with Dr. Fricke's examination and diagnosis of Garrison in connection with the section 1367/1368 hearing—which were disclosable—and those that were associated with Dr. Fricke's employment as an expert hired by Goldscheider, which were not. The court made arrangements for defense counsel to obtain copies of the disclosable material. At a subsequent foundational hearing, the

trial court reaffirmed its ruling that material generated by Dr. Fricke in connection with his court appointment and the determination of Garrison's competency to stand trial were disclosable, but that anything else was the product of Dr. Fricke's employment as a defense expert and was thus privileged.

At a foundational hearing to determine what part, if any, of Dr. Wilkinson's notes was potentially disclosable, Attorney Chris Motley appeared from the county counsel's office, representing Dr. Wilkinson in his capacity as an employee of Forensic Mental Health Services. Motley had Dr. Wilkinson's reports and other material associated with services provided to Garrison by Forensic Mental Health Services. The trial court reviewed the material in camera, considered its relevance, and concluded that, on balance, defendant's right to a fair trial and his need fairly to impeach Garrison outweighed the psychotherapist-patient privilege. The court ordered almost all the material in Forensic Mental Health Services' records disclosed, with the exception of a recent report concerning some trivial matters. Included in the material disclosed were reports by Dr. Wilkinson and two other psychiatrists, Dr. Sayed Hamed and Dr. Aldo Lubrano, and a clinical psychologist, Dr. Richard Hayward. The reports indicated, among other things, that Garrison suffered from "episodes of auditory hallucinations and paranoid delusions," but that, with medication, these symptoms diminished.

Dr. Wilkinson testified before the jury later that day. He explained that he had examined Garrison, at the suggestion of Dr. Hayward, after Garrison had experienced problems with other inmates, reported hearing voices in his head, and seemed confused and disorganized. Dr. Hayward had examined Garrison at Chope Hospital's psychiatric emergency room, where Garrison had been sent after a fight with another inmate, and had started him on a small dose of Ativan, a mild tranquilizer. Garrison was then returned to the county jail, where Dr. Wilkinson examined him the next day and found that he had difficulty organizing his thoughts and seemed to lose his train of thought. Garrison also reported hearing voices in his head and experiencing paranoid delusions, usually that people in the jail were going to harm him. Dr. Wilkinson suspected Garrison was suffering from paranoid schizophrenia, and Garrison agreed to begin taking the antipsychotic drug, Navane, in addition to his Ativan. He later switched to the antipsychotic drug, Haldol. After taking the medication, Garrison reported that he was not hearing voices any more, although he seemed more delusional.

On cross-examination, the prosecutor elicited from Dr. Wilkinson the opinion that Garrison appeared honest, although he qualified that opinion by explaining that he was talking about honesty or dishonesty as a "conscious

voluntary behavior," not the type of "disordered responses" he might get when Garrison was psychotic. One of the delusions from which Garrison suffered was that he would miraculously be released from jail. Dr. Wilkinson also admitted that it was difficult to conclude Garrison was suffering from paranoid delusions because he had in fact been actually harmed by another inmate, receiving second degree burns when the inmate threw hot water in his face. He also got into fights while in jail.

Following Dr. Wilkinson's testimony, the trial judge stated he was satisfied with his ruling on the privilege question because of the amount of mental health material defense counsel was able to place in the record to impeach Garrison's credibility.

Defendant then called Dr. Fricke to the stand. Fricke affirmed he had been appointed by the court to examine Garrison for competence to stand trial. He had interviewed Garrison on December 24, 1987, and submitted a report dated January 31, 1988, concluding Garrison was incompetent to stand trial. Dr. Fricke explained that he had administered, or tried to administer, several psychological tests, the results of which indicated a severe mental disturbance. Reading from his report, Dr. Fricke concluded: "Mr. Garrison was psychotic at the time of this evaluation. He was disoriented and showed significant confusion. He showed evidence of thought disorder both in process and in content." He also "engaged in bizarre rituals" involving hand movements and "showed psychomotor retardation [i.e., abnormally slow body movement], was humorless, and spoke in monosyllables. He . . . was perseverative [i.e., engaged in repetitive movements] and showed . . . gross disorganization in thinking which is clearly a result of his mental state." At a subsequent evaluation in March 1988, Dr. Fricke reported that Garrison had "improved significantly" and was competent to stand trial.

b. *Discussion*

 By denying him full access to Garrison's psychiatric records, defendant claims the trial court violated his constitutional right to confront the witnesses against him. (U.S. Const., 6th & 14th Amends.)[4] Of course, the mental illness or emotional instability of a witness can be relevant on the

---

[4]Defendant also claims that denial of pretrial discovery denied him his federal constitutional rights to due process, to a fair trial, to counsel, and to present a defense. (U.S. Const., 5th, 6th, 8th & 14th Amends.) As he does not individually discuss these claims, or present any authorities in support, we do not discuss them further. (*People v. Earp* (1999) 20 Cal.4th 826, 884 [85 Cal.Rptr.2d 857, 978 P.2d 15] ["we need not consider on appeal mere contentions of error unaccompanied by legal argument"].) To the extent defendant suggests Garrison was incompetent to testify, we agree with respondent that defendant's failure to object to

issue of credibility, and a witness may be cross-examined on that subject, if such illness affects the witness's ability to perceive, recall or describe the events in question. (*People v. Herring* (1993) 20 Cal.App.4th 1066, 1072 [25 Cal.Rptr.2d 213]; *People v. Anderson* (2001) 25 Cal.4th 543, 608 [106 Cal.Rptr.2d 575, 22 P.3d 347] (conc. opn. of Kennard, J.).)

The trial court determined at the outset that some of the records defendant sought might be privileged by the psychotherapist-patient privilege. (Evid. Code, § 1014.) The court decided it should examine in camera those psychiatric records of Garrison's that were not additionally privileged from disclosure by the attorney-client privilege. The court believed it should weigh the need for Garrison's privacy as a patient against defendant's right to cross-examine him to ensure a fair trial. In so ruling, the trial court relied on *People v. Reber* (1986) 177 Cal.App.3d 523 [223 Cal.Rptr. 139], which stated the prevailing rule at the time of defendant's trial. After defendant's trial, however, we disapproved *Reber* in *People v. Hammon* (1997) 15 Cal.4th 1117 [65 Cal.Rptr.2d 1, 938 P.2d 986] (*Hammon*).

We explained in *Hammon*: "The court in *Reber* believed the confrontation clause of the Sixth Amendment (U.S. Const., 6th Amend.), as interpreted in *Davis v. Alaska* (1974) 415 U.S. 308 [94 S.Ct. 1105, 39 L.Ed.2d 347], required pretrial disclosure of privileged information when the defendant's need for the information outweighed the patient's interest in confidentiality. In authorizing disclosure before trial, however, *Reber* went farther than *Davis* required, with insufficient justification." (*Hammon, supra,* 15 Cal.4th at p. 1123.) We explained that *Davis v. Alaska* addressed trial rights, not pretrial disclosure of information, and that a broader reading of *Davis* "is called into question in light of the United States Supreme Court's decision in *Pennsylvania* v. *Ritchie* (1987) 480 U.S. 39 [107 S.Ct. 989, 94 L.Ed.2d 40]. . . , which was handed down shortly after *Reber, supra,* 177 Cal.App.3d 523." (*Hammon, supra,* at p. 1124.) There was no majority opinion in *Pennsylvania* v. *Ritchie*, but, after that case, "it is not at all clear 'whether or to what extent the confrontation or compulsory process clauses of the Sixth Amendment grant pretrial discovery rights to the accused.' (*People v. Webb* (1993) 6 Cal.4th 494, 517-518 [24 Cal.Rptr.2d 779, 862 P.2d 779]. . . .)" (*Hammon, supra,* at p. 1126.)

 Under *Hammon, supra,* 15 Cal.4th 1117, psychiatric material is generally undiscoverable prior to trial. Defendant, then, received more discovery than he was legally entitled to, for he received the records generated

Garrison's testimony on that ground forfeited the claim for appeal. (See *People v. Williams* (1988) 45 Cal.3d 1268, 1320, fn. 6 [248 Cal.Rptr. 834, 756 P.2d 221].)

by Dr. Fricke in connection with his examination of Garrison for competence (Evid. Code, § 1017, subd. (a)),[5] the Chope Hospital records, and those records of Dr. Wilkinson generated in connection with his treatment of Garrison at the San Mateo County jail. Defendant also received virtually all of Garrison's Forensic Mental Health Services records, and he fails to show how denial of access to the few records that were withheld prejudiced him.

Despite the amount of psychiatric material the trial court disclosed with which defendant could impeach Garrison, defendant contends his constitutional confrontation rights were nevertheless violated because he was not given access to the material generated by Dr. Fricke and Dr. Wilkinson in connection with their employment by Attorney Goldscheider as defense experts for Garrison. Thus, for example, Dr. Fricke apparently generated some material from examinations of Garrison that were unrelated to the trial court's appointment. Similarly, Dr. Wilkinson apparently treated or examined Garrison at times unrelated to his role as a mental health professional who provided services to the San Mateo County jail.

The trial court found those treatment records were privileged by the attorney-client privilege (Evid. Code, § 954) and thus not subject to in camera inspection or a balancing of their importance with defendant's interest in a fair trial. The trial court was correct. ■ At the outset, we note that communications privileged by Evidence Code section 954 include "confidential communications made by the client to a physician for the purpose of transmitting such information to the attorney." (*People v. Lines* (1975) 13 Cal.3d 500, 510 [119 Cal.Rptr. 225, 531 P.2d 793]; *City & County of S. F. v. Superior Court* (1951) 37 Cal.2d 227, 237 [231 P.2d 26, 25 A.L.R.2d 1418]; 2 Witkin, Cal. Evidence (4th ed. 2000) Witnesses, § 122, pp. 378-379.) ■ Thus, communications Garrison made to Dr. Fricke and Dr. Wilkinson in their capacity as defense experts hired by Goldscheider were fully privileged by the attorney-client privilege. Although it is unusual for a potential defendant in a murder case (Garrison) to hire as his own expert both the court-appointed mental health expert (Dr. Fricke) and the expert who has provided mental health services to jail inmates (Dr. Wilkinson), we cannot say on this record that such employment necessarily deprived defendant of his constitutional right to confront Garrison.

■ Communications potentially can be privileged under both the psychotherapist-patient privilege and the attorney-client privilege, and even if

---

[5]Evidence Code section 1017, subdivision (a) provides: "There is no privilege under this article if the psychotherapist is appointed by order of a court to examine the patient, but this exception does not apply where the psychotherapist is appointed by order of the court upon the request of the lawyer for the defendant in a criminal proceeding in order to provide the lawyer with information needed so that he or she may advise the defendant whether to enter or withdraw a plea based on insanity or to present a defense based on his or her mental or emotional condition."

the former privilege is waived or otherwise inoperative, the latter privilege will still operate to render the communication confidential and privileged. (*People v. Lines, supra,* 13 Cal.3d at p. 513.) ▮ Thus, the attorney-client privilege can apply here even though we conclude the psychotherapist-patient privilege does not apply by virtue of Evidence Code section 1017.

▮ "The attorney-client privilege is one of the oldest recognized privileges for confidential communications" (*Swidler & Berlin v. United States* (1998) 524 U.S. 399, 403 [118 S.Ct. 2081, 2084, 141 L.Ed.2d 379]) and is "one which our judicial system has carefully safeguarded with only a few specific exceptions" (*Mitchell v. Superior Court* (1984) 37 Cal.3d 591, 600 [208 Cal.Rptr. 886, 691 P.2d 642]). We have held that a criminal defendant's right to due process does not entitle him to invade the attorney-client privilege of another. (*People v. Johnson* (1989) 47 Cal.3d 1194, 1228 [255 Cal.Rptr. 569, 767 P.2d 1047].) ▮ To the extent defendant claims his right to confrontation or due process entitles him to gain access to the confidential communications between Garrison, his attorney, and his defense experts, he is thus mistaken.

Moreover, even if defendant were entitled to disclosure of more psychiatric background material, any error in this regard was harmless beyond a reasonable doubt in light of the large amount of material already disclosed and made available to impeach Garrison. The jury was informed that Garrison was psychotic at the time he was arrested, that he was taking tranquilizing medication as well as antipsychotic medication, that he originally was found incompetent to stand trial, that he heard voices in his head (auditory hallucinations), that he was paranoid and believed inmates were intending to do him harm, that he engaged in unusual and repetitive hand movements, and that he was generally confused and disorganized in his thinking. The jury was also informed of the terms of Garrison's plea agreement with the prosecution and the incentive such agreement may have created to divert the majority of the blame for the crime towards defendant. We assume the jury considered these factors in reaching a decision on Garrison's credibility. We conclude any error in failing to disclose more of Garrison's psychiatric records was harmless.

Defendant also contends the trial court's denial of full disclosure of Garrison's psychiatric records denied him a fair appeal. Although we have stressed "the importance of an adequate record as one of the basic tools of an effective appeal" (*In re Steven B.* (1979) 25 Cal.3d 1, 8 [157 Cal.Rptr. 510, 598 P.2d 480]; see generally Cal. Rules of Court, rule 39.51), that is not to conclude the record is inadequate unless the defendant obtains full disclosure of a third party's psychiatric records. As we have explained, defendant

obtained the records underlying Dr. Fricke's competency examination of Garrison, Dr. Wilkinson's treatment records while the doctor worked for Forensic Mental Health Services, and the records from Chope Hospital. In light of this level of disclosure of potentially impeaching material, as well as other information (such as the terms of Garrison's plea agreement) with which defendant could have undermined Garrison's credibility, we disagree that the absence of even fuller disclosure created an "insuperable barrier to meaningful appellate review."

We have reviewed the sealed records in camera, and nothing contained therein alters our conclusion that further disclosure was not necessary to ensure defendant obtained a fair appeal.

### 2. Problems with Pretrial Contact with Garrison

#### a. Discovery of the prosecutor's pretrial interview notes

Prior to trial, defendant moved for discovery of all witness statements and notes of witness interviews, including all notes of interviews with Garrison. The trial court granted the motion, but it later came to light that the prosecutor, in the presence of police investigators, had twice interviewed Garrison prior to trial, preparing him for testifying in court, but had not divulged any notes of the interviews to defense counsel. Defendant objected and alleged that Garrison might have made statements helpful to the defense at these interviews and that the prosecutor had acted in bad faith in failing to disclose this information. The trial court found the information obtained during the interviews was subject to the existing discovery order, but that the prosecutor had acted in good faith in believing otherwise. The court accordingly ordered the prosecutor to reconstruct the interviews and make the information obtained from Garrison available to defense counsel. When defense counsel received the information, he agreed with the trial court that it yielded nothing of great importance.

Defendant argues the prosecutor intentionally refrained from taking notes during these pretrial interviews with Garrison to evade his continuing duty to provide discovery to defendant. We reject the claim because nothing in the record indicates the prosecution intentionally refrained from taking notes.

#### b. Denial of defendant's request to interview Garrison before trial

Defendant claims the denial of full discovery of Garrison's psychiatric records and the prosecutor's interview notes was aggravated by the trial

court's denial of defense counsel's request to interview Garrison before trial. In light of the perceived precarious state of Garrison's mental health, all parties had some concern about his anticipated testimony before the jury. Defense counsel asked to have an opportunity to interview Garrison, but the trial court impliedly denied his request. Defendant now claims the trial court erred in so ruling.

Defendant identifies no authority, and we are aware of none, that would have permitted the trial court to authorize defense counsel to interview Garrison before trial. Garrison was represented by Goldscheider at that time, and nothing in the record indicates whether or not he would have permitted the interview or advised Garrison to waive his privilege against compelled self-incrimination. Defendant was apprised of Garrison's pretrial statements to police and the prosecutor, and was given the opportunity to question him at trial. He was entitled to nothing more.

### 3. *Voir Dire of Jurors*

Defendant next complains about alleged errors connected with the selection of jurors at the guilt phase of the trial. (Because this jury hung on penalty, it was not the jury that eventually imposed the death penalty.)

#### a. *Hovey voir dire*

■ Defendant first contends the *Hovey* voir dire (*Hovey v. Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301]), by which prospective jurors are asked individually about their views on the death penalty and may be excused if they would not vote to impose the death penalty under any circumstances, violated the standards laid down by the high court in *Witherspoon v. Illinois* (1968) 391 U.S. 510 [88 S.Ct. 1770, 20 L.Ed.2d 776]. (But see *Wainwright v. Witt* (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841] [juror may be excused if "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath' "].)[6] Additionally, he claims that the *Hovey* procedure results in a jury that does not represent a fair cross-section of the community, in that the jury will contain a disproportionate share of persons who are "submissive in the face of authority" and "who cannot approach the prosecution's evidence in an appropriately skeptical and inquiring frame of mind." Relying on Justice Marshall's dissenting

---

[6]Defendant does not challenge that part of *Hovey, supra,* 28 Cal.3d 1, requiring, as a judicially declared rule of criminal procedure, that prospective jurors be sequestered from other jurors when questioned about their views on the death penalty. That part of *Hovey* was superseded by statute as explained in *Covarrubias v. Superior Court* (1998) 60 Cal.App.4th 1168 [71 Cal.Rptr.2d 91]. (See *People v. Waidla* (2000) 22 Cal.4th 690, 713 [94 Cal.Rptr.2d 396, 996 P.2d 46].) Code of Civil Procedure section 223 now gives trial courts discretion whether or not to sequester the prospective jurors.

opinion in *Lockhart v. McCree* (1986) 476 U.S. 162, 184 [106 S.Ct. 1758, 1770-1771, 90 L.Ed.2d 137], defendant argues the *Hovey* voir dire produced a jury that was more prone to return a guilty verdict and more likely to exclude members of racial minorities. He also argues the prosecutor's ability to exercise peremptory challenges exacerbated these problems.

At the threshold, it appears defendant failed to object to the *Hovey* voir dire on these grounds and thus failed to preserve these issues for appeal. (*People v. Avena* (1996) 13 Cal.4th 394, 413 [53 Cal.Rptr.2d 301, 916 P.2d 1000].) Defendant, however, contends in his reply brief that if we find he failed to preserve the issue for appeal, we should find his trial counsel were constitutionally ineffective for failing to preserve the issue. We need not address this contention because even assuming for argument the issue is properly before us, we find no error,[7] as it is now settled that the *Hovey* voir dire procedure is constitutional and does not deny a capital defendant his right to an impartial or a representative jury. (*People v. Stanley* (1995) 10 Cal.4th 764, 797-798 [42 Cal.Rptr.2d 543, 897 P.2d 481]; *People v. Cummings* (1993) 4 Cal.4th 1233, 1279 [18 Cal.Rptr.2d 796, 850 P.2d 1].) Nor does the procedure improperly discriminate against racial minorities (*People v. Johnson, supra,* 47 Cal.3d at pp. 1214-1215) or produce a conviction-prone or death-penalty-prone jury (*People v. Carrera* (1989) 49 Cal.3d 291, 331 [261 Cal.Rptr. 348, 777 P.2d 121]). Finally, the prosecutor's use of peremptory challenges does not exacerbate the alleged problem. (*Ibid.*)

 b. *Informing the jurors defense counsel expected them to return a guilty verdict*

Defendant next contends his defense counsel were constitutionally ineffective in informing some jurors, during questioning on voir dire, that they expected the jury to return a guilty verdict, which would require them to participate in a penalty phase. Defendant overstates the number of times counsel made such admissions, but that makes no difference. Counsel may have concluded that honesty and candor with the jurors was necessary so as not to lose credibility with them. Counsel may also have seen no disadvantage to such admissions given that defendant had admitted he knowingly participated in the robbery and murder of Dolinka (although he claimed Garrison was the actual killer) and was thus clearly guilty of murder with special circumstances at a minimum, and the trial court had ruled that defendant's admissions would not be excluded from trial. In any event, the record does not indicate counsel's reasons for making such admissions to

---

[7]Because there was no error, we need not resolve respondent's further contention that defendant also forfeited the claim by failing to exhaust his statutory allotment of peremptory challenges.

some prospective jurors, so we reject the contention that counsel were ineffective. (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267 [62 Cal.Rptr.2d 437, 933 P.2d 1134] [issue of counsel's effectiveness more appropriately raised in a petition for a writ of habeas corpus].)

 c. *Defendant allegedly was tranquilized during voir dire*

 ██ ██ Defendant contends the trial court committed reversible error by conducting voir dire while he was under the influence of tranquilizers to such an extent that we should conclude he was not "present." (See § 977, subd. (b) ["The accused shall be personally present"]; *Riggins v. Nevada* (1992) 504 U.S. 127 [112 S.Ct. 1810, 118 L.Ed.2d 479].)[8] He contends the trial court characterized him as looking "totally droopy" and thus should have stopped the proceedings. He is mistaken: it was defense counsel who so characterized defendant. The trial court disagreed with counsel's assessment, noting it did not see a "great difference in [defendant's] appearance." The trial court discussed the matter with defense counsel, Philip Barnett, and counsel assured the court that defendant was mentally and physically able to participate despite having taken some tranquilizers two nights before to help him sleep and another medicine the next night. The trial court assured defendant that if he felt ill, uncomfortable or dizzy, it would halt the proceedings. Later that afternoon, defendant stated he felt all right. We thus reject the claim that the trial court improperly allowed voir dire to proceed when defendant was severely impaired by his

---

[8]"It is a fundamental assumption of the adversary system that the trier of fact observes the accused throughout the trial, while the accused is either on the stand or sitting at the defense table. This assumption derives from the right to be present at trial, which in turn derives from the right to testify and rights under the Confrontation Clause. [Citation.] At all stages of the proceedings, the defendant's behavior, manner, facial expressions, and emotional responses, or their absence, combine to make an overall impression on the trier of fact, an impression that can have a powerful influence on the outcome of the trial. If the defendant takes the stand . . . his demeanor can have a great bearing on his credibility and persuasiveness, and on the degree to which he evokes sympathy. The defendant's demeanor may also be relevant to his confrontation rights. See *Coy* v. *Iowa*, 487 U.S. 1012, 1016-1020 [108 S.Ct. 2798, 2800-2803, 101 L.Ed.2d 857] (1988) (emphasizing the importance of the face-to-face encounter between the accused and the accuser). [¶] The side effects of antipsychotic drugs may alter demeanor in a way that will prejudice all facets of the defense. Serious due process concerns are implicated when the State manipulates the evidence in this way. . . ." (*Riggins v. Nevada, supra,* 504 U.S. at p. 142 [112 S.Ct. at p. 1819] (conc. opn. of Kennedy, J.).) "As any trial attorney will attest, serious prejudice could result if medication inhibits the defendant's capacity to react and respond to the proceedings and to demonstrate remorse or compassion. The prejudice can be acute during the sentencing phase of the proceedings, when the sentencer must attempt to know the heart and mind of the offender and judge his character, his contrition or its absence, and his future dangerousness. In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps, be determinative of whether the offender lives or dies. [Citation.]" (*Id.* at pp. 143-144 [112 S.Ct. at pp. 1819-1820].)

medication with tranquilizers, for there is no substantial evidence his medication had a palpable effect on him.

## C. Trial Issues

### 1. Issues Involving Defendant's Confession

Police spoke to defendant on June 17 and 21, 1988. The first interview was partially tape-recorded, the second fully recorded. Only evidence from the first interview was admitted at trial. In that interview, defendant admitted critical facts about his participation in the crimes of which he now stands convicted. He claims on appeal that admission at trial of his statements to police on June 17, 1988, violated his rights under various provisions of the federal Constitution. His primary claim is that police violated his rights as set forth in *Miranda, supra,* 384 U.S. 436. As we explain, he is mistaken.

#### a. Facts

Prior to trial, defendant moved to exclude the statements he had given to police on June 17, 1988. He claimed: (i) critical portions of the interview intentionally were not recorded by the investigating officers, thereby compromising his ability to litigate the question of the voluntariness of his confession in violation of his right to due process; (ii) his *Miranda* waiver was invalid because the officers deceived him by misrepresenting that they were investigating a robbery instead of a capital murder; and (iii) the confession was involuntary.

The following information was ascertained at the hearing on defendant's motions. Investigating the information obtained from Garrison, Sergeant Quinn concluded that the man known as "Apache" was defendant. Quinn located defendant in Folsom State Prison, where he was serving a term for an unrelated second degree murder. Quinn and Detective McCarthy traveled to Folsom on June 17, 1988, to interview defendant. Quinn had a tape recorder in a briefcase; before defendant arrived in the interview room, he recorded the time and date on the tape. The recorder was otherwise hidden from view.

Defendant arrived, and the officers engaged him in some small talk to put him at ease. Sergeant Quinn then read defendant his *Miranda* rights from a card supplied by the City of Daly City. Defendant said he understood his

rights, read the card himself, and signed it in the officers' presence.[9] He exhibited no reservations or hesitancy. This part of the interrogation was not recorded, but after defendant waived his rights Quinn surreptitiously turned on the recorder. Quinn explained the secrecy, testifying that some people do not speak as freely when they know they are being recorded. When the tape ran out, Quinn did not replace it for fear of distracting defendant, who was showing signs of nervousness. Detective McCarthy, however, took notes of the entire interrogation.

Quinn began the interrogation by informing defendant he was interested in discussing a robbery that had occurred some years before. Only after they began discussing the case did Quinn reveal there also had been a homicide. McCarthy informed defendant the case carried the potential for the death penalty, and defendant indicated he understood. The officers informed defendant that they had enough evidence to charge him with the crime and the interview would be the only time he could tell his side of the story because, once he was arraigned, "we would not be able to talk to him again because he would have to have a lawyer around." McCarthy explicitly denied promising defendant he would be arraigned on lesser charges or receive less time in prison if he told his side of the story, although he advised defendant that Garrison's attorney was attempting to obtain a plea bargain for his client. The officers said that if defendant wanted to tell his side of the story, they would bring it to the attention of the prosecuting attorney.

During the interview, defendant initially denied knowing Garrison, then admitted knowing him only vaguely. As the interview progressed, defendant admitted to a stronger acquaintance with Garrison and to participation in the robbery, but denied the murder. This change may have been prompted by the officers' telling defendant that Garrison was placing primary blame for the robbery and murder on defendant, and that witnesses had placed defendant in the vicinity of the crime shortly before the murder.

Both Sergeant Quinn and Detective McCarthy expressly denied threatening defendant in any way. Both officers also expressly denied promising defendant leniency, immunity or a reward should he confess. The interrogation began around 10:00 in the morning and ended around 1:00 in the afternoon. The interrogation was continuous, but breaks were taken.

The officers returned on June 21, 1988, with a representative from the prosecutor's office, and defendant reiterated his statement. This interview was recorded in its entirety.

---

[9]Detective McCarthy also testified at the hearing that defendant waived his *Miranda* rights.

The parties stipulated the trial court could listen to and consider the recording of the June 17th interview, the transcript of the recording, the *Miranda* warning card, Detective McCarthy's notes, and the transcript of the preliminary examination. Following the hearing, the trial court denied defendant's motions. The court indicated its ruling would be the same whether the People's burden was beyond a reasonable doubt or by a preponderance of the evidence.

b. *Miranda/involuntariness*

Defendant first contends "the prosecution failed to make even a threshold showing [of voluntariness] because they failed to demonstrate that appellant was informed of his *Miranda* rights." We recently explained the applicable law: ▆▆ "When reviewing a trial court's decision on a motion that a statement was collected in violation of the defendant's rights under *Miranda, supra,* 384 U.S. 436, we defer to the trial court's resolution of disputed facts, including the credibility of witnesses, if that resolution is supported by substantial evidence. [Citation.] Considering those facts, as found, together with the undisputed facts, we independently determine whether the challenged statement was obtained in violation of *Miranda*'s rules [citation], that is, whether (assuming the defendant was in custody) the statement was preceded by the now-famous admonition of *Miranda* rights: the defendant has the right to remain silent, any statement he might make can be used against him, he has the right to the presence of an attorney, and an attorney will be provided at state expense if he cannot afford one. (*Dickerson v. United States* (2000) 530 U.S. 428, 435 [120 S.Ct. 2326, 2331-2332, 147 L.Ed.2d 405].) [¶] If a custodial defendant requests counsel, all questioning must cease. (*Edwards v. Arizona* (1981) 451 U.S. 477, 482 [101 S.Ct. 1880, 1883-1884, 68 L.Ed.2d 378].) Statements made by a custodial defendant in the absence of *Miranda* warnings are inadmissible in the prosecution's case-in-chief." (*People v. Weaver* (2001) 26 Cal.4th 876, 918 [111 Cal.Rptr.2d 2, 29 P.3d 103].)

▆▆ Neither side disputes that Quinn and McCarthy were interrogating defendant or that defendant was in custody. The only issues, then, are whether substantial evidence supports the trial court's conclusion that defendant was given *Miranda* warnings before giving his June 17th statement, whether he invoked his right to counsel, and whether he was tricked into waiving his rights by improper police deception.

Both officers testified that Quinn informed defendant of his rights, and their testimony was supported by the actual card defendant had signed. The trial court specifically accepted the officers' testimony as truthful; consequently, substantial evidence supports the court's resolution of the issue.

Normally this would suffice to conclude no violation of the familiar *Miranda* rules occurred. Defendant contends, however, that Quinn's failure to record the *Miranda* admonition and defendant's waiver is suspicious. Indeed, defendant argues Quinn took quite a bit of trouble *not* to record the *Miranda* admonition and waiver. As indicated, however, Quinn explained the circumstances that led to the partial recording: he secretly turned on his hidden tape recorder after defendant had waived his rights and, when the tape ran out, decided against putting in a new tape for fear of distracting defendant. We assume the trial court considered the plausibility of this explanation together with Sergeant Quinn's credibility before it ruled in the People's favor.

We also assume the court considered the fact that the officers had engaged in small talk before interrogating defendant. Unlike defendant, we cannot assume such pre-interview banter necessarily suggests the *Miranda* warning was jokingly delivered or was otherwise conveyed in a manner lacking the solemnity defendant argues such warnings require. The officers explained they wished to place defendant at ease before starting the interrogation. The trial court observed the officers testify, and we assume it evaluated their credibility on this issue.

To the extent defendant suggests that by engaging in small talk Quinn and McCarthy improperly "soften[ed] him up" before extracting a *Miranda* waiver, we disagree. First, we find defendant did not raise this objection in his moving papers below. "As a result, the parties had no incentive to fully litigate this theory below, and the trial court had no opportunity to resolve material factual disputes and make necessary factual findings" (*People v. Ray* (1996) 13 Cal.4th 313, 339 [52 Cal.Rptr.2d 296, 914 P.2d 846]), such as the nature and effect of the type of small talk in which the officers engaged. We conclude the objection was not preserved for appeal. (*Ibid.*)

Second, even assuming for argument the issue was preserved, we find it lacks merit. ■ We have explained that "[w]hen the waiver results from a clever softening-up of a defendant through disparagement of the victim and ingratiating conversation, the subsequent decision to waive without a *Miranda* warning must be deemed to be involuntary for the same reason that an incriminating statement made under police interrogation without a *Miranda* warning is deemed to be involuntary." (*People v. Honeycutt* (1977) 20 Cal.3d 150, 160-161 [141 Cal.Rptr. 698, 570 P.2d 1050].) ■ But unlike in *Honeycutt*, neither Quinn nor McCarthy discussed the victim. Nor is there any other evidence suggesting that the manner in which Quinn and McCarthy engaged in small talk overbore defendant's free will. *Honeycutt* is thus distinguishable.

Defendant argues due process requires application of a blanket rule requiring that all interrogations, including the *Miranda* warnings and waivers, be

tape-recorded to facilitate later determinations of voluntariness. He cites *Stephan v. State* (Alaska 1985) 711 P.2d 1156 in support. While we have no wish to discourage law enforcement officials from recording such interrogations, we have already found that such a blanket rule is not required to protect the due process rights of those being interrogated (*People v. Holt* (1997) 15 Cal.4th 619, 663-665 [63 Cal.Rptr.2d 782, 937 P.2d 213]), and defendant fails to raise any argument convincing us that *Holt* was incorrectly decided.

Defendant next contends his *Miranda* waiver was vitiated by Quinn and McCarthy's promise that anything defendant told them, "we're going to keep between us." He claims such a promise was "diametrically opposed to the statement that whatever [defendant] told the police officers could and would be used against him in a court of law." ▇ If the police had actually promised defendant his statements would not be used against him, contrary to the earlier *Miranda* warning, an error of constitutional dimension would have occurred. (See, e.g., *People v. Quartermain* (1997) 16 Cal.4th 600 [66 Cal.Rptr.2d 609, 941 P.2d 788].)

▇ As with the previous claim that the officers softened him up, defendant did not raise in his moving papers below the claim that he spoke in reliance on the officers' promise not to divulge his statements to anyone. Accordingly, the officers were not asked to explain the meaning of their assertion that they would "keep between us" defendant's revelations.[10] Consequently, the objection was not preserved for appeal. (*People v. Ray*, *supra*, 13 Cal.4th at p. 339.)

Even were we to assume the issue is properly before us, we find defendant's claim cannot be sustained, for the record does not support a conclusion that the officers made a promise to hold defendant's statements in confidence, or that defendant understood their comments as constituting such a promise. To begin with, the record is somewhat ambiguous and should be placed in context. In the course of the long interrogation, Detective McCarthy explained to defendant that Garrison had placed the blame for the crime primarily on defendant. McCarthy explained that "[w]e're interested in this guy, Mark [Garrison]. OK, obviously we can't tell you everything. But he knows certain things about this case . . . too." McCarthy told defendant the district attorney had not yet charged Garrison because of Garrison's allegations suggesting defendant was the actual killer. When defendant retorted,

---

[10]Compare this case to *People v. Jackson* (1980) 28 Cal.3d 264, 297-298 [168 Cal.Rptr. 603, 618 P.2d 149], raising essentially the same claim, where the interrogating officers and the defendant testified on this precise topic, the defendant failing to assert he was deceived or misled by the officers' comments.

"That ain't true," McCarthy responded: "Well, we know [it] isn't. Only because of, No. 1, what he said, and No. 2 what some other people have told us. OK, again, I can't go into what the other people have told us because, *what you tell us we're going to keep between us*. Just like if somebody else tells us something, you know, that's why like I told you, we're going to know." (Italics added.) Despite this fleeting comment, defendant continued to deny his involvement.

Placed in context, McCarthy's statement that "what you tell us we're going to keep between us" is but a fleeting comment during a long interrogation that was meant to communicate to defendant why the officers could not reveal everything Garrison had told them. Reading the whole transcript, we conclude McCarthy did not promise defendant that his statements would remain confidential, nor did defendant understand McCarthy's comment to mean that all that was said would remain confidential. Finally, defendant makes no showing he understood McCarthy's brief comment to vitiate the *Miranda* warning given just minutes earlier. We conclude that, assuming the issue was preserved for appeal, the officers did not promise defendant his comments would remain confidential. Accordingly, we find no *Miranda* violation. To the extent defendant separately contends his statements were involuntary due to the officers' promises, we also find the trial court's rejection of this claim was proper.

c. *Admission of incomplete recording of defendant's first interview*

As noted, the June 17, 1988, interview was only partially tape-recorded. The prosecution offered the entire tape recording as evidence, but an issue arose as to the admissibility of extraneous statements contained in the recording: the prosecutor was concerned about defendant's self-serving statements, and defense counsel was concerned about the officers' hearsay and accusatory insinuations. It was agreed the parties would edit out offending statements. In addition, defendant argued the recording of the second police interview with him, conducted a few days after the June 17th interview, should (with the exception of the discussion of defendant's prior murder) be admitted without any redactions because the entire interview had been recorded. The prosecution disagreed, arguing the intervening days between the first and second police interrogations allowed defendant to think about how to slant his story to portray his involvement in the crime in the best light. The prosecution ultimately did not introduce the second recording into evidence.

█ Defendant argues that the trial court committed a number of errors by admitting the redacted recording of the June 17th interview. He first

claims the redacted recording was so distorted and misleading that it "should certainly have been excluded as more prejudicial than probative." We assume defendant is referring to Evidence Code section 352, but he nowhere asserts he made such an objection at trial. Moreover, even if such a claim was preserved, the gist of defendant's argument is that the full recording included much information favorable to him that had been redacted. For example, in the interview defendant claimed he had at first been less than forthcoming with police because he had gotten married while in prison, vowed to change his life, and just wanted to serve his present term and join his wife; he had discouraged Garrison from harming Dolinka; he was not personally responsible for the stabbing; and that when he saw Dolinka emerge from the service station, he did not appear to be badly hurt.

Even had defendant moved to exclude the redacted June 17th recording pursuant to Evidence Code section 352, the trial court should properly have denied the motion. The "fuller picture" defendant argues should have been presented to the jury consisted of self-serving hearsay not otherwise admissible at trial. (See Evid. Code, § 1220 [to qualify as a party admission, a hearsay statement must be introduced *against* the declarant].) Defendant was free to present this information by taking the stand himself. To allow him to present this evidence through admission of the unredacted recording would have allowed him to present favorable evidence without subjecting himself to cross-examination. " 'A defendant in a criminal case may not introduce hearsay evidence for the purpose of testifying while avoiding cross-examination.' " (*People v. Edwards* (1991) 54 Cal.3d 787, 820 [1 Cal.Rptr.2d 696, 819 P.2d 436], quoting *People v. Harris* (1984) 36 Cal.3d 36, 69 [201 Cal.Rptr. 782, 679 P.2d 433] (plur. opn. of Broussard, J.).)

Defendant further argues that "[p]roviding the jury with this type of truncated, distorted, and misleading 'confession' deprived [him] of state and federal due process, and of his Sixth Amendment right to a fair trial." It again appears that defendant did not preserve this issue for appeal by raising the constitutional claim below. Assuming, however, for argument the issue is properly before us, we find it lacks merit: defendant's trial was not rendered fundamentally unfair nor was he deprived of his Sixth Amendment rights merely because the trial court did not allow him to spread before the jury his own hearsay statements insulated from cross-examination.

Defendant also contends that, by playing for the jury the edited version of the recording of his June 17th statements, and also ruling the prosecution was not obligated to introduce the recording of his June 21st interview with police, the trial court subjected him to unfair pressure to testify, thereby burdening his constitutional right to refrain from testifying. (*Griffin v.*

*California* (1965) 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106].) Defendant exaggerates his dilemma. First, defense counsel willingly participated in the redaction of the June 17th recording because the recording contained information damaging to his client, such as the fact defendant was already in prison when the interview occurred. Second, the trial court was correct in ruling that it could not force the People to introduce the second recording into evidence. Finally, even assuming undue pressure was placed on defendant to testify, he apparently was able to withstand the pressure, for he did not take the stand. Accordingly, there was no violation of defendant's Fifth Amendment rights.

### d. *Alleged Beagle error*

Defendant had previously been convicted of rape in 1978, attempted grand theft from the person in 1982, grand theft from the person in 1984, and murder in 1986. Anticipating that the prosecution would introduce such evidence as impeachment should he testify, defendant moved to exclude evidence of these convictions pursuant to Evidence Code section 352.[11] His motion addressed the law both pre-Proposition 8 (*People v. Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1] (*Beagle*)) and post-Proposition 8 (*People v. Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111] (*Castro*)).[12] The trial court discussed the motion as a "Castro motion" and ruled all four convictions were admissible for impeachment purposes.[13]

---

[11]Defendant's motion was in response to the prosecution's notice of aggravation (§ 190.3), which alleged these four prior convictions. As the prosecutor stipulated during the penalty phase of trial, however, defendant had pleaded guilty to a *misdemeanor* violation of attempted grand theft from the person. Thus, his 1982 conviction could not properly be used to impeach him should he decide to testify. (Evid. Code, § 788 [felony conviction may be used to attack witness's credibility].)

[12]"Proposition 8 on the June 1982 California primary election ballot added section 28, subdivision (d) . . . , to article I of the California Constitution. That section provides, inter alia: 'Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding . . . .' " (*In re Lance W.* (1985) 37 Cal.3d 873, 879 [210 Cal.Rptr. 631, 694 P.2d 744].)

[13]The trial court explained: "I have no difficulty at all in concluding that each of those [prior convictions] involve the subject of moral turpitude as referred to in People versus Castro. That's clear and the law is abundantly clear in that regard."

Later, the court stated: "[T]he court recognizing that a defendant should not be . . . given a false aura of credibility; and further noting that the convictions in this particular case do range from 1978 through 1986; and that the jurors are entitled to have an accurate and complete picture and complete information regarding the area of the credibility of witnesses[,] finds that the defendant may be impeached with the four prior convictions that are set forth in the moving papers and responding papers . . . . [¶] . . . [¶] Making this finding, the court does balance, then, the potential prejudicial effect upon Mr. Gurule against the probative value [of the evidence] . . . , finding . . . the potential for a clear and truthful and accurate

Defendant later sought reconsideration of the ruling, arguing that the case was governed not by *Castro, supra*, 38 Cal.3d 301, but by pre-Proposition 8 law. The court agreed and, this time applying *Beagle, supra*, 6 Cal.3d 441, again ruled defendant's prior felony convictions would be available for impeachment. The court explained that it still believed witnesses should not be allowed to testify under a false aura of credibility, and, "[w]ith that thinking, and on rebalancing in light of Beagle, the Court does reconsider its ruling, and nevertheless, rules similarly. Namely, that I feel the nature of the offenses, the time frame within which the prior convictions have occurred, does fairly and accurately give the jurors some guidance at least in terms of the issue of credibility of a person who has suffered such convictions."

 Defendant now argues the trial court erred, and the error, coupled with the court's earlier ruling permitting admission into evidence of a redacted recording of his June 17th interview with police, placed him in the dilemma of staying silent and allowing the People to present this truncated version of his statements, or testifying to clarify his statement and suffering impeachment with his prior felony convictions. He contends his prior convictions had little bearing on his truthfulness, were highly prejudicial due to their similarity to the crimes against Dolinka, and were remote in time.

The People essentially concede error as to the prior rape and murder convictions. Although they note the prior convictions were not remote in time because defendant essentially was in prison during the time between the convictions, and thus his convictions had not " 'been followed by a legally blameless life' " (*Beagle, supra*, 6 Cal.3d at p. 453), the People admit the rape and murder convictions did not bear directly on defendant's veracity as required by *Beagle* and its progeny. (See, e.g., *People v. Rist* (1976) 16 Cal.3d 211, 221 [127 Cal.Rptr. 457, 545 P.2d 833].) They also concede the murder and grand theft convictions are "somewhat similar" to the Dolinka crimes, but argue that conviction for grand theft from the person, being a larcenous crime, bears heavily on credibility. Assuming there was *Beagle* error, the People argue strenuously it was harmless.

 Dolinka was killed in May 1982, just prior to the passage of Proposition 8 in June 1982. Accordingly, defendant's case is governed by *Beagle, supra*, 6 Cal.3d 441, and not *Castro, supra*, 38 Cal.3d 301. (*People v. Smith* (1983) 34 Cal.3d 251, 262 [193 Cal.Rptr. 692, 667 P.2d 149]; *People v. Pickett* (1985) 163 Cal.App.3d 1042, 1047 [210 Cal.Rptr. 85].)

Although the law before *Castro, supra*, 38 Cal.3d 301, gave trial courts discretion to admit or exclude prior felony convictions for purposes of

picture of a person's credibility in this instance outweighs any potential prejudice against the defendant, and on those grounds will permit impeachment, should the defendant testify in these proceedings."

impeachment, this court, in a long line of cases, had developed guidelines for courts to follow. Thus, for example, prior convictions for crimes whose elements were relevant to a person's veracity (such as fraud or deceit) were more likely admissible than mere acts of violence or other assaultive behavior. (*People v. Barrick* (1982) 33 Cal.3d 115, 122 [187 Cal.Rptr. 716, 654 P.2d 1243].) The nearness or remoteness in time of the prior conviction was also a factor, as was whether the defendant had led a blameless life between the prior conviction and the present one. (*Ibid.*) Whether the defendant was charged with a crime substantially similar to that underlying a prior conviction, as well as the importance of hearing the defendant's version of events, were other relevant considerations. (*Id.* at pp. 122-123.)

As the People concede, the trial court abused its discretion under *Beagle, supra,* 6 Cal.3d 441, by ruling defendant's prior murder and rape convictions could be admitted to impeach him should he choose to testify. Defendant's conviction for murder was similar to the crime against Dolinka (*People v. Spearman* (1979) 25 Cal.3d 107, 116 [157 Cal.Rptr. 883, 599 P.2d 74]), and his convictions for murder and rape do not strongly suggest he was prone to dishonesty (*People v. Holt* (1984) 37 Cal.3d 436, 456-457 [208 Cal.Rptr. 547, 690 P.2d 1207] [murder conviction does not indicate witness "was disposed to falsify"]; see *People v. Rist, supra,* 16 Cal.3d at p. 221 [rape not relevant to lack of honesty]).

On the other hand, the trial court did not abuse its discretion in ruling defendant's grand theft conviction could be admitted to impeach him, for theft crimes necessarily involve an element of deceit. "The crime[] of grand larceny . . . [is] recognized as reflective of a person's honesty and integrity, and [is] therefore probative for purposes of impeachment." (*People v. Anjell* (1979) 100 Cal.App.3d 189, 196 [160 Cal.Rptr. 669].)

Having determined the trial court abused its discretion in ruling defendant's prior convictions for rape and murder could be admitted for impeachment purposes, we turn to the question whether the error requires reversal. We agree with respondent it does not. As noted, had defendant testified, he properly would have been impeached with his 1984 felony conviction for grand theft from the person. Moreover, the evidence against defendant was quite strong, for his coperpetrator, Mark Garrison, testified against him and numerous aspects of Garrison's story were consistent with evidence already known to the police.

Finally, although defendant did not testify, the jury heard his side of the story from Sergeant Quinn and Detective McCarthy, who recounted defendant's statements in the June 17th interrogation admitting having planned and

executed the robbery but placing the blame for killing Dolinka squarely and solely on Garrison's shoulders. Although it is true, as defendant argues, that police had an incentive to inculpate him, he does not explain how his story would have been any different had he testified himself.

Considering together the availability of the prior felony conviction for impeachment, the strong evidence of defendant's guilt, and the fact his version of the crime reached the jury, we conclude the trial court's error was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. (See *People v. Barrick, supra,* 33 Cal.3d at p. 130 [applying *Watson*]; *People v. Woodard* (1979) 23 Cal.3d 329, 341 [152 Cal.Rptr. 536, 590 P.2d 391] [same].)

### 2. *Opening Statements*

Defendant next contends the prosecutor committed misconduct in his opening statement at the guilt phase of trial and that his own defense counsel was constitutionally ineffective in his opening statement to the jury. We reject both contentions.

#### a. *Alleged prosecutorial misconduct*

Defendant contends the prosecutor engaged in two instances of misconduct in his opening remarks. First, he claims the prosecutor stated that Garrison would testify he was unsure whether he could go through with the planned robbery and murder, but that defendant assuaged his doubts by telling him not to worry because he (defendant) had killed someone before. Defendant argues this assertion by the prosecutor was "inadmissible, prejudicial and inflammatory," and made in bad faith. At the outset, we note defendant did not object to this statement nor request that the jury be admonished, thus failing to preserve the issue for appeal. (*People v. Hill* (1998) 17 Cal.4th 800, 820 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

Defendant, however, claims defense counsel's statement, uttered a few minutes later in beginning his own opening remarks, that the prosecutor's opening statement "almost sounds like a closing argument," served as an objection and placed the trial court on notice that a curative admonition was necessary. We disagree; in addition to coming well after the allegedly offending statement, defense counsel's comment was ambiguous and could not reasonably have indicated to the trial court that he was objecting to the prosecutor's earlier remark about defendant's alleged comment to Garrison that he had committed a previous homicide.

Defendant argues that if we find the issue was not preserved for appeal, we should find counsel ineffective for failing to object. Of course " '[a]n

attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel' (*People* v. *Kelly* (1992) 1 Cal.4th 495, 540 [3 Cal.Rptr.2d 677, 822 P.2d 385])." (*People v. Williams* (1997) 16 Cal.4th 153, 221 [66 Cal.Rptr.2d 123, 940 P.2d 710].) In this instance, the trial court had already ruled before trial that Garrison's testimony on this point was admissible; hence, counsel had no ground on which to object. Moreover, even if defendant could conjure up some ground on which the prosecutor's brief comment could be characterized as objectionable, defense counsel may simply have desired not to highlight the comment by objecting. We find no prosecutorial misconduct and no ineffectiveness of counsel.

Defendant contends the prosecutor engaged in a second form of misconduct in his opening statement when he argued his case to the jury instead of summarizing it. Defendant also failed to preserve this issue for appeal by interposing a timely objection and requesting that the jury be admonished. In any event, "[t]he function of an opening statement is not only to inform the jury of the expected evidence, but also to prepare the jurors to follow the evidence and more readily discern its materiality, force, and meaning." (*People v. Dennis* (1998) 17 Cal.4th 468, 518 [71 Cal.Rptr.2d 680, 950 P.2d 1035].) The prosecutor did not transgress these limits.

### b. *Alleged ineffective assistance of counsel*

In addition to the instances noted above in which defendant claims his trial counsel should have objected, he contends counsel was ineffective in his own opening remarks by conceding defendant's guilt of robbery and first degree murder. The constitutional standard for determining whether counsel has failed to provide adequate legal representation is by now well known: First, a defendant must show his or her counsel's performance was "deficient" because counsel's "representation fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms." (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 [104 S.Ct. 2052, 2064-2065, 80 L.Ed.2d 674]; *People v. Weaver, supra,* 26 Cal.4th at p. 925.) Second, he or she must then show prejudice flowing from counsel's act or omission. (*Strickland, supra,* at pp. 691-692 [104 S.Ct. at pp. 2066-2067]; *Weaver, supra,* at p. 925.) We will find prejudice when a defendant demonstrates a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*In re Sixto* (1989) 48 Cal.3d 1247, 1257 [259 Cal.Rptr. 491, 774 P.2d 164], citing *Strickland, supra,* at p. 694 [104 S.Ct. at p. 2068].) "Finally, it must also be shown that the [act or] omission was not attributable to a tactical

decision which a reasonably competent, experienced criminal defense attorney would make." (*In re Sixto, supra,* at p. 1257.)

Philip Barnett and Vincent O'Malley represented defendant at trial. Mr. Barnett gave the opening statement for the defense. In part, he told the jury: "There's no question in this case that two people robbed young Elliott Dolinka. There's no question that Mr. Gurule and Mr. Garrison were those two people. The issue for you to decide in the guilt portion of the case is who killed Elliott Dolinka, also, what intent, if any, Mr. Gurule may have had with regard to the death of Elliott Dolinka. I'm not going to try to go into the legal issues that are involved in that. Judge Stevens, at the appropriate time, will instruct you as to what the law is. Both Mr. Luft [the prosecutor] and our side will get to argue to you.

"I would simply say to you, there is not a question of whether there was a robbery, and there's not a question as to whether Elliott Dolinka was killed during the course of that robbery. That is why in the careful process of jury selection when we talked to each of you individually we frankly told you that we felt that you would return a verdict of first degree murder in the case, as we saw it. The judge will instruct you as to what first degree murder is; that you will find that a murder during the course of a robbery is a first degree murder, regardless of which person actually did the killing.

"So that, you'll find that even if Raymond Gurule did not kill Elliott Dolinka in this case, still, the framing Garrison did was part of a robbery; that that would be first degree murder as to Mr. Gurule. It is, however, important as to the special circumstance before you now for you to reach conclusions as to who did the killing and as to what intent Mr. Gurule had." When Barnett then made an oblique reference to the prior-murder special-circumstance allegation, the prosecutor objected and the trial court sustained the objection.

■ Defendant contends any concession by counsel that his client was guilty constitutes ineffective assistance irrespective of the circumstances. He is mistaken. (*People v. Cain* (1995) 10 Cal.4th 1, 31 [40 Cal.Rptr.2d 481, 892 P.2d 1224]; *People v. Mayfield* (1993) 5 Cal.4th 142, 177 [19 Cal.Rptr.2d 836, 852 P.2d 331].) That is not to say such concessions of guilt can never be ineffectiveness of counsel; the cases defendant cites in support demonstrate that a defense attorney's concession of his client's guilt, lacking any reasonable tactical reason to do so, can constitute ineffectiveness of counsel. (See, e.g., *People v. Davis* (1957) 48 Cal.2d 241, 257 [309 P.2d 1]; *People v. Diggs* (1986) 177 Cal.App.3d 958, 970-971 [223 Cal.Rptr. 361].)

In the instant case, Barnett's concession of defendant's guilt was not unreasonable. Defendant had admitted his participation in the robbery to the

police; his story was that it was Garrison who actually had killed the victim by slicing his throat. As Barnett admitted to the jury, defendant's role in the crimes constituted first degree murder on a felony-murder theory at the least. The only question was the identity of the actual killer. As in other cases where the evidence of guilt is quite strong, "it is entirely understandable that trial counsel, given the weight of incriminating evidence, made no sweeping declarations of his client's innocence but instead adopted a more realistic approach, namely, that although defendant and others may have committed [some of the charged crimes], and may have aided and abetted the acts of violence which caused the victims' deaths, nonetheless any such acts were [not so serious as to warrant the most severe punishment]. As stated in a recent case, 'good trial tactics demanded complete candor' with the jury. (*People* v. *Powell* (1974) 40 Cal.App.3d 107, 167 [115 Cal.Rptr. 109].) Under the circumstances we cannot equate such candor with incompetence." (*People v. Jackson, supra,* 28 Cal.3d at pp. 292-293, disapproved on another point in *People v. Cromer* (2001) 24 Cal.4th 889, 901, fn. 3 [103 Cal.Rptr.2d 23, 15 P.3d 243]; see also *People v. Mayfield, supra,* 5 Cal.4th at p. 177 ["candor may be the most effective tool available to counsel"].)

We thus conclude counsel was not ineffective for admitting to the jury defendant's guilt of robbery and first degree murder.

### 3. *Alleged Problems with the Admission of Garrison's Testimony*

Garrison was obviously the People's star witness. Defendant contends the trial court committed a number of errors in deciding to admit Garrison's testimony.

#### a. *Garrison's failure to identify defendant in court*

Garrison, who is African-American, testified that prior to the crime, he had body work done on his Oldsmobile Cutlass. He did not know the man who worked on his car, but Garrison described him as a dark-skinned man, five feet six to eight inches tall, with "kind of straight" hair. This description matched defendant. Significantly, Garrison also testified that the man had the word "Apache" tattooed on the inner part of his forearm. Defendant bears such a tattoo. Garrison testified the two agreed to commit a robbery, jointly decided to target Barry's Chevron, and consummated their plan, resulting in Elliott Dolinka's murder.

Garrison testified the man he knew as "Apache" lived four blocks from the body shop. Sergeant Quinn later testified defendant lived in that area.

Garrison's account was corroborated by Shirley Funk, who reported seeing an African-American man at Barry's Chevron, and then a man who was

neither Caucasian nor African-American, but possibly Hispanic or Asian, come up and speak to the African-American man. Another witness, David McLaughlin, positively identified defendant as the dark-skinned man who came up to converse with Garrison.

At trial, which (it must be remembered) was seven years after the crime, defense counsel asked Garrison whether defendant was the man he knew as "Apache," who had participated in the Dolinka crime with him. The following exchange took place:

"A. [Garrison] It doesn't look like him to me, no.

"Q. [Defense Counsel Barnett] So is it your testimony that that is or is not the person or that you don't know?

"A. I would say I don't know."

Defense counsel then moved to strike Garrison's testimony. "It's apparent that Mr. Garrison is not identifying Mr. Gurule as the person whom he knew as Apache and who committed this crime with him." The trial court denied the motion.

Defendant contends the trial court erred by denying his motion to strike Garrison's testimony because, in light of Garrison's failure to identify defendant in court, his testimony was not relevant. A trial court "has no discretion to admit irrelevant evidence." (*People v. Turner* (1984) 37 Cal.3d 302, 321 [208 Cal.Rptr. 196, 690 P.2d 669], disapproved on another ground in *People v. Anderson* (1987) 43 Cal.3d 1104, 1149 [240 Cal.Rptr. 585, 742 P.2d 1306]; Evid. Code, § 351 ["all relevant evidence is admissible"].) Respondent counters that defendant failed to preserve the claim for appeal. Although a close case is presented on the forfeiture issue, we conclude that even if defendant adequately preserved this claim, the trial court did not err in denying the motion to strike Garrison's testimony.

Addressing the forfeiture issue first, respondent argues defendant failed to preserve the claim for appeal because the trial court denied the motion to strike Garrison's testimony without prejudice, stating it was premature, thereby impliedly inviting defendant to renew the motion after the People had completed presenting their case. Defendant rightly points out the trial court expressly stated "The court denies your request to strike the testimony of Mr. Garrison . . . ," suggesting he had made a timely objection and had obtained a final decision on the objection. But immediately after denying the

motion, the trial court explained that "over a period of time people do change in their appearance, not deliberately necessarily, but by reason of age alone." The court noted the prosecutor had not yet completed his presentation of the case and that the relevance of Garrison's testimony might be shown by other evidence the prosecutor might yet introduce. Accordingly, "[y]our motion to that exten[t] *may be taken under submission* to the extent there is no connection drawn between Mr. Gurule and Apache. However, . . . at best I would say that your motion is premature." (Italics added.)

As can be seen, by stating it was taking the matter under submission, the trial court left the door open for defendant to renew his objection if, on completion of the People's case, insufficient evidence linked defendant to the person Garrison referred to as "Apache." Because no additional evidence on the issue of Garrison's identification of defendant was presented, it is at least arguable that defendant was justified in relying on his earlier objection and that the matter was preserved for appeal despite his failure to renew his objection.

We need not, however, resolve the forfeiture point. Assuming for argument the issue was preserved, we find the trial court did not err. The trial court has broad discretion to determine the relevance of evidence (*People v. Champion* (1995) 9 Cal.4th 879, 922 [39 Cal.Rptr.2d 547, 891 P.2d 93], disapproved on another point in *People v. Ray, supra,* 13 Cal.4th at p. 369, fn. 2 (conc. opn. of George, C. J., joined by a majority of the court)), and its decision to await the complete presentation of the People's case before making a final decision was reasonable.

Defendant further argues his defense counsel were ineffective for failing to move for a mistrial in light of Garrison's inability to identify defendant. "A motion for mistrial is directed to the sound discretion of the trial court. We have explained that '[a] mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.'" (*People v. Jenkins* (2000) 22 Cal.4th 900, 985-986 [95 Cal.Rptr.2d 377, 997 P.2d 1044], quoting *People v. Haskett* (1982) 30 Cal.3d 841, 854 [180 Cal.Rptr. 640, 640 P.2d 776].)

 In light of the other evidence of defendant's guilt, most prominently his admission to police of his participation in the robbery, it is clear the trial court would have denied a motion for mistrial for lack of prejudice had defense counsel made the motion. Accordingly, we reject defendant's claim that his counsel were constitutionally ineffective. We likewise reject

for the same reason defendant's further claim, made with little discussion, that the trial court should have directed a verdict of acquittal.

### b. *The effect of Garrison's plea bargain*

As noted (*ante*, at pp. 588-589), the terms of Garrison's plea bargain permitted the People to reopen his case if new evidence was uncovered that he, and not defendant, was the actual killer. Defendant contends this made Garrison an "inherently unreliable witness" because his plea bargain "was conditional upon his promise to testify in conformity with the state's theory that [defendant] was the actual killer."

Once again respondent contends that defendant failed to preserve the issue by making a timely objection. Defendant gives this issue scant attention, merely alleging in his reply brief that "if" counsel failed to object, they were constitutionally ineffective. Defendant makes no attempt to elucidate whether or not defense counsel objected to Garrison's testimony on the ground his plea bargain was inherently coercive (see *People v. Jenkins*, *supra*, 22 Cal.4th at p. 1050; Cal. Rules of Court, former rule 15(a), now see rule 14(a)(1)(C)), and our reading of the record discloses no such objection. Accordingly, we conclude defendant failed to preserve this issue for appeal.

Turning to whether trial counsel were ineffective for failing to object (but see *People v. Williams*, *supra*, 16 Cal.4th at p. 221 [failure to object rarely ineffective]), defendant contends counsel should have been aware of the issue, as *People v. Medina* (1974) 41 Cal.App.3d 438 [116 Cal.Rptr. 133] states the legal proposition and was decided well before trial. The rule is more definitively set forth in *People v. Allen* (1986) 42 Cal.3d 1222, 1251-1252 [232 Cal.Rptr. 849, 729 P.2d 115], a case also decided before defendant's trial: " '[A] defendant is denied a fair trial if the prosecution's case depends substantially upon accomplice testimony and the accomplice witness is placed, either by the prosecution or the court, under a strong compulsion to testify in a particular fashion.' (*People* v. *Medina*[, *supra*,] 41 Cal.App.3d [at p.] 455 . . . .) Thus, when the accomplice is granted immunity subject to the condition that his testimony substantially conform to an earlier statement given to police (*id.*, at p. 450), or that his testimony result in the defendant's conviction [citation], the accomplice's testimony is 'tainted beyond redemption' [citation] and its admission denies the defendant a fair trial. On the other hand, although there is a certain degree of compulsion inherent in any plea agreement or grant of immunity, it is clear that an agreement requiring only that the witness testify fully and truthfully is valid." (Fn. omitted.)

 Garrison's plea agreement did not run afoul of these limits. It provided in pertinent part that Garrison would plead guilty or nolo contendere to first degree murder, admit the truth of a prior serious felony conviction enhancement, and receive a sentence of 30 years to life in prison. The bargain further states that Garrison "will fully cooperate with [authorities] in the investigation and prosecution of criminal offenses, including but not limited to the murder of Elliott Dolinka. Defendant Garrison's cooperation will include, but not be limited to, providing truthful and complete statements concerning the actions and criminal offenses of all persons involved in the murder of Elliott Dolinka and/or the robbery of Barry's Chevron gas station on May 15, 1982, including Raymond Anthony Gurule and defendant Garrison himself. Further, defendant Garrison will remain available to law enforcement agencies during the investigation and prosecution of persons involved in the murder of Elliott Dolinka and/or the robbery of Barry's Chevron station, and will testify truthfully and completely in all criminal proceedings involving the murder of Elliott Dolinka and/or the robbery of Barry's Chevron station, regardless of whether those proceedings occur before or after the sentencing of defendant Garrison in this case, and regardless of whether the proceedings involve an initial trial, a re-trial, should one become necessary, or a proceeding following trial. [¶] . . . Provided that no evidence is obtained proving that defendant Mark Anthony Garrison is the actual killer of Elliott Dolinka, the defendant [Garrison] will not be prosecuted for special circumstance murder in this case. [¶] . . . Should defendant Mark Anthony Garrison refuse to testify or should he at any time testify untruthfully, then this entire agreement is null and void and all of the original charges will be automatically reinstated with no limitation on possible sentence."

Garrison did not agree to testify in conformity with a prior statement or agree to ensure defendant would be convicted. Instead, he agreed to cooperate with law enforcement and to "provid[e] truthful and complete statements concerning the actions and criminal offenses" with which he was involved. This case is thus like *People v. Sully* (1991) 53 Cal.3d 1195, 1217 [283 Cal.Rptr. 144, 812 P.2d 163], where we approved a condition of immunity in which an accomplice was allowed to plead guilty on the condition she "give a complete and truthful account at trial in order to avoid breaching the plea agreement." As we explained in *People v. Garrison* (1989) 47 Cal.3d 746, 768 [254 Cal.Rptr. 257, 765 P.2d 419], "[a] prosecutor may grant immunity to one jointly charged with a crime upon the condition that he or she testify fully and fairly as to the facts involved."

Although it is true this immunity agreement was conditional on there being no new evidence showing Garrison was the actual killer,[14] and this condition probably resulted in some pressure on Garrison not to testify that he—and not defendant—actually stabbed the victim, that pressure already existed, for the plea agreement required Garrison to "provid[e] truthful and complete statements," and it was clear the prosecutor believed that Garrison's statement to police that defendant was the actual killer was true. (See *People v. Johnson, supra,* 47 Cal.3d at p. 1229.)

Because nothing about the terms of Garrison's plea bargain was improperly coercive, we conclude counsel were not ineffective for failing to object to his testimony on that ground.

### c. *Denial of a daily transcript*

Defendant contends he was denied his constitutional rights to confrontation, due process and a fair trial by the trial court's ruling denying his counsel an opportunity to examine the daily transcript of Garrison's testimony on direct examination before they began their cross-examination. Considered together with the additional alleged errors of being denied full access to Garrison's psychiatric records, the prosecutor's deliberately not taking or producing notes of interviews with Garrison, and the trial court's denial of defendant's request to interview Garrison before trial (all addressed, *ante,* and found wanting), defendant contends he was unfairly surprised by Garrison's testimony on cross-examination. He also suggests that denial of the daily transcripts was for financial reasons, which he claims also violates his constitutional rights.

We agree with respondent that the record does not support defendant's claim. The record shows that on completion of Garrison's direct examination, the defense asked to continue the proceedings until 1:30 p.m. the next day on the ground that the daily transcripts of Garrison's direct testimony would not be available until 9:00 a.m. The trial court simply denied the request. "The determination of whether a continuance should be granted rests within the sound discretion of the trial court, although that discretion may not be exercised so as to deprive the defendant or his attorney of a reasonable opportunity to prepare." (*People v. Sakarias* (2000) 22 Cal.4th 596, 646 [94 Cal.Rptr.2d 17, 995 P.2d 152].) Defendant does not explain how the trial court's ruling deprived him of a reasonable

---

[14]The prosecutor stated for the record that the District Attorney of San Mateo County would extend the immunity to protect Garrison in the event that information acquired as a result of discovery of his psychotherapist-patient records or attorney-client material suggested he was the actual killer.

opportunity to prepare. Accordingly, we reject the argument that the court's ruling violated his constitutional rights.

#### d. *Restriction on cross-examination of Garrison*

Defendant next contends the trial court violated his constitutional rights to confrontation, due process and a fair trial (i) when it failed to curtail the prosecutor's practice of interposing numerous objections to defense counsel's questioning of Garrison about his prior sexual molestation of a small boy; (ii) by prohibiting questioning about an incident in which Garrison beat a 15-month-old baby with a belt; and (iii) when it prohibited counsel from introducing evidence that Garrison had minimized his responsibility in previous crimes. We address these claims seriatim.

(i) Defense counsel resumed their cross-examination of Garrison on September 12, 1989, by asking him about his previous conviction for molesting a small boy. Counsel's point was to convey Garrison's belief that allowing the boy to live and testify against him had been a mistake, making it more likely that Garrison had killed Dolinka so as to leave no witnesses. Counsel also wished to demonstrate that in his prior crimes, Garrison had admitted culpability but had attempted to shift the majority of the blame elsewhere, thus bolstering the defense position that it was Garrison, not defendant, who actually killed Dolinka.

The record shows that counsel was able to get Garrison to admit his prior sex crime without interruption. During subsequent defense questioning, however, the prosecutor interposed numerous objections, all of which the trial court overruled. Defendant now contends the prosecutor made so many frivolous objections that "the flow and meaning of the cross-examination were lost," and the trial court violated his constitutional rights by failing to curtail the prosecutor's actions.[15] We note at the outset that counsel made no objection on this particular ground, so defendant must be heard to complain that the trial court violated a sua sponte duty to control the prosecutor. Although defendant presents a generalized argument on the acknowledged benefits of cross-examination, he fails to assert any argument or authority on the specific theory raised. (See, e.g., § 1044.)[16] We may reject his claim for that reason alone. Were we to address it further, we would conclude the

---

[15]Defendant does not allege the prosecutor committed misconduct, though he suggests as much. In any event, we conclude he forfeited that claim by failing to object on that ground.

[16]Section 1044 provides: "It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved."

record fails to demonstrate that the prosecutor's actions were so severely prejudicial the trial court was obligated to intervene, even in the absence of a defense objection. (See *People v. Arias* (1996) 13 Cal.4th 92, 159-160 [51 Cal.Rptr.2d 770, 913 P.2d 980].)

(ii) Defendant next argues the trial court erred by precluding him from impeaching Garrison with evidence that he had beaten a 15-month-old child with a belt. Counsel argued the evidence was relevant to impeach Garrison's statements that he was not a "violent man" and that he would not use violence on another human being unless he was defending himself. The trial court explained that it was defense counsel, and not the prosecutor, who had elicited this testimony, and a party cannot ask a witness a question in order to later impeach him. (*People v. Mayfield* (1997) 14 Cal.4th 668, 748 [60 Cal.Rptr.2d 1, 928 P.2d 485]; *People v. Lavergne* (1971) 4 Cal.3d 735, 744 [94 Cal.Rptr. 405, 484 P.2d 77].) Although it sustained the prosecutor's objection to this line of questioning, the court noted it had allowed defendant's questioning about the sex crime, and the jury would undoubtedly consider that to be evidence of Garrison's violent nature. In any event, whether or not Garrison had beaten the infant with a belt was a collateral matter; trial courts have "discretion to admit or exclude evidence offered for impeachment on a collateral matter" (*People v. Mayfield, supra,* at p. 748), and defendant does not demonstrate the trial court abused its broad discretion in this matter.

Defendant also contends he was denied his constitutional right to present a defense by the trial court's subsequent decision to preclude him from calling as witnesses the mother and sister of the child involved in the beating incident. He claims their testimony would have been proper rebuttal evidence. As we conclude the trial court did not abuse its discretion in precluding defendant from questioning Garrison on this collateral matter, it similarly did not abuse its discretion in ruling defendant could not call witnesses to prove the same point.

(iii) Defendant also argues the trial court erred in prohibiting him from introducing evidence of other crimes whose circumstances indicated that Garrison employed a habit of admitting some blame but then shifting the bulk of the blame elsewhere. It seems doubtful the proffered instances of prior misconduct demonstrate that Garrison engaged in blame-shifting as a habit or custom (as defense counsel argued), as distinct from the common tendency of criminal offenders generally to minimize their culpability (as the trial court suggested). In any event, it does not appear the trial court abused its wide discretion in this matter. As we explained in an analogous situation, defendant merely "was precluded from proving [his point] with time-consuming hearsay and character evidence that was not particularly probative on

the question." (*People v. Jones* (1998) 17 Cal.4th 279, 305 [70 Cal.Rptr.2d 793, 949 P.2d 890].)

 To the extent defendant contends the alleged restrictions on his cross-examination of Garrison, addressed above, violated his rights to confrontation, due process, a fair trial, and a reliable penalty, we reject those claims as well: " 'As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense. Courts retain, moreover, a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice.' (*People v. Hall* (1986) 41 Cal.3d 826, 834 [226 Cal.Rptr. 112, 718 P.2d 99]." (*People v. Jones, supra,* 17 Cal.4th at p. 305.) Defendant does not explain why the routine evidentiary rulings of which he complains rise to the level of a constitutional violation.

e. *Permitting Sergeant Quinn to bolster Garrison's testimony*

 Defendant next contends the trial court erred by permitting Sergeant Quinn to testify and recount Garrison's admissions. Defendant characterizes Garrison as "less than an ideal witness" and claims the People were unfairly permitted to bolster his credibility by having a police officer testify and essentially repeat everything Garrison said. Defendant specifically identifies those portions of Quinn's testimony in which Quinn reported that Garrison had called the police with no prompting and had confessed to his participation before being offered a plea bargain, that Quinn determined the man Garrison knew only as "Apache" was defendant, and that Garrison stated that defendant told him he (defendant) had killed someone in the past.

The gist of defendant's argument is that all such testimony was inadmissible hearsay. The trial court disagreed, ruling the evidence was admissible on the basis that, because the defense had suggested Garrison's story was a recent fabrication to come within the terms of his plea bargain, the People were entitled to show that his prior statement to Sergeant Quinn, given before the plea bargain, was consistent with his testimony. In truth, however, the jury had already heard much of the evidence of which defendant now complains from when Quinn testified earlier in the trial. Thus, for example, Quinn already had recounted the circumstances of how Garrison called the police and reported his involvement in the Dolinka murder.[17] Although respondent contends defendant failed to object to the admission of any

---

[17]When defense counsel objected to Quinn's testimony on the ground it was redundant and cumulative, the court *sustained* the objection with the exception that the prosecutor would be allowed to question Quinn on those aspects of Garrison's testimony that were "subject to controversy" or where there was some inconsistency.

evidence on this ground, defense counsel made a standing objection and thus preserved the issue for appeal.

In any event, we find no error, as the trial court properly ruled that Garrison's prior consistent statements were admissible to rebut the suggestion he recently had fabricated his story. (*People v. Hayes* (1990) 52 Cal.3d 577, 609 [276 Cal.Rptr. 874, 802 P.2d 376]; Evid. Code, §§ 791, subd. (b), 1236.) Consequently, we also reject defendant's claim that the trial court abused its discretion by failing to grant defense counsel's motion for a mistrial based on Quinn's testimony.

Although defendant further claims that Sergeant Quinn's testimony constituted a form of improper vouching for the credibility of a witness (cf. *People v. Bain* (1971) 5 Cal.3d 839, 848 [97 Cal.Rptr. 684, 489 P.2d 564] ["a prosecutor [may not] express a personal opinion or belief in a defendant's guilt"]), he is incorrect. Quinn merely testified to prior consistent statements of the witness to rebut a claim of recent fabrication.

In addition, defendant contends Quinn was allowed to usurp the role of a psychiatric expert when the trial court permitted him (over defense objection) to answer the prosecutor's question whether he had observed "any delusional or hallucinatory speech or conduct on the part of Mr. Garrison." Quinn was not qualified to offer a professional psychological diagnosis, as both the prosecutor and the trial court stated before the jury. Nevertheless, the court made clear to the jury that Quinn's answer would reflect his own observations as a layperson. Quinn thereafter testified that Garrison did not appear distracted or hesitant during the interview, was responsive to questions, and "his attention was always toward the speaker." We perceive no error: laypersons may testify to their observations of a witness's behavior outside the therapeutic setting that is relevant to the overall question of the witness's mental state. (*People v. Marshall* (1997) 15 Cal.4th 1, 32 [61 Cal.Rptr.2d 84, 931 P.2d 262].)

To the extent defendant contends the admission of Quinn's testimony violated his rights to confrontation, due process, a fair trial, and fundamental fairness, we reject those claims as well. (See *People v. Jones, supra,* 17 Cal.4th at p. 305.)

### 4. *Stipulation as to Mrs. Dolinka's Testimony*

The prosecution proposed to call the victim's mother to the stand to testify to certain facts about her son. For example, she would testify that Dolinka was of slight build, of a nonviolent character, a fervent member of a

fundamentalist Christian church that believed in nonviolence and peaceful resolution of disputes, and did not carry a weapon of any sort. Defendant, understandably, objected, claiming such evidence was improper victim impact evidence, at that time (1989) inadmissible even in the penalty phase. (*Booth v. Maryland* (1987) 482 U.S. 496 [107 S.Ct. 2529, 96 L.Ed.2d 440]; but see *Payne v. Tennessee* (1991) 501 U.S. 808 [111 S.Ct. 2597, 115 L.Ed.2d 720] [overruling *Booth*].) Moreover, some of the evidence (e.g., that the victim was not carrying a weapon on the morning of his death) was to be introduced in a highly inflammatory manner (e.g., his mother knew this because she felt no weapon when she hugged him goodbye on the morning of his murder). The trial court tentatively ruled that such evidence would be admissible. The parties then, after much negotiation, agreed to a stipulation that covered most of the facts to which Mrs. Dolinka would have testified.[18]

---

[18]The stipulation, which was read to the jury, stated: "It is stipulated that Mrs. Rhonda Dolinka, if called to the stand, would testify to the following facts, which are not contested:

"First. On May 15, 1982, Elliott Dolinka was 15 years old.

"Secondly. At the time of his death, Elliott Dolinka was six feet tall, 150 pounds, slight of build.

"Thirdly. Elliott Dolinka was a nonviolent, nonaggressive teenager.

"Four. Elliott Dolinka did not engage in assaultive behavior.

"Five. Elliott Dolinka's mother had never observed him strike another person. [¶] . . . [¶]

"Six. Elliott Dolinka had never been in trouble at school for aggressive behavior, including physical fights.

"Seven. Elliott Dolinka's mother had never seen him use a knife, a tool or a club of any kind as a weapon.

"Eight. Elliott Dolinka's mother had never seen him handle a firearm.

"Nine. Elliott Dolinka had no attraction to weapons.

"Ten. Elliott Dolinka was never known to carry a knife or gun.

"11. Elliott Dolinka had never taken classes in martial arts.

"12. Elliott Dolinka was an active member of [the] Church of the Highland in San Bruno and a practicing fundamentalist, whose practice and philosophy was nonconfrontation, peaceful resolution of conflict and forgiveness.

"13. Elliott Dolinka had been interested in cars since age nine, when he rebuilt an old car with a neighbor.

"14. Elliott Dolinka started working at Barry's Chevron less than one year before his death.

"15. Elliott Dolinka worked at the service station on weekends and sometimes after school.

"16. If Elliott Dolinka was alone at Barry's Chevron at night, he would call his mother. She would go to Barry's Chevron and remain in the parking lot to watch Elliott close up.

"17. Mr. Dolinka, which reference is to Elliott Dolinka's father, instructed Elliott that if he was ever robbed while at work, he should (a) follow instructions, (b) offer no resistance, and, (c) give all the money to the person robbing him.

"18. On the morning of May 15, 1982, Elliott Dolinka went into his parents' room at approximately 6:30 a.m. to say goodbye.

"19. Elliott Dolinka got a ride to work with his neighbor Renee Giordano.

"20. Elliott was wearing his Chevron uniform, navy blue pants, navy blue jacket . . . and a blue shirt.

"And 21. On May 15, 1982, when Mrs. Dolinka hugged Elliott and said goodbye, she never saw nor felt any object which could be used as a weapon upon his person."

 Defendant now contends he was coerced into entering into a disadvantageous stipulation by the trial court's erroneous evidentiary ruling permitting what he characterizes as improper victim impact evidence. Although he admits that the stipulation was better for the defense than Mrs. Dolinka's live testimony, it "did not begin to cure the prejudice arising from the court's erroneous ruling." Respondent counters that because defendant entered into the stipulation, he necessarily agreed to it and therefore cannot appeal on that ground.

We face here the collision of two legal principles. On the one hand, respondent is correct that when a party enters into a voluntary stipulation, he generally is precluded from taking an appeal claiming defects in the stipulation. (Cf. *People v. Ervin* (2000) 22 Cal.4th 48, 73 [91 Cal.Rptr.2d 623, 990 P.2d 506] [stipulation to a particular method of juror selection].)

On the other hand, Evidence Code section 1103, subdivision (a) provides: "In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by [Evidence Code] Section 1101 if the evidence is: [¶] (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character. [¶] (2) Offered by the prosecution to rebut evidence adduced by the defendant under paragraph (1)." Because defendant did not offer any evidence that Elliott Dolinka acted in an aggressive or confrontational manner during the crime, the trial court erred under Evidence Code section 1103 in ruling the People could introduce evidence of his peaceful and nonviolent character and his unfamiliarity with weapons. The trial court's erroneous ruling placed defense counsel in a dilemma: object, allow Mrs. Dolinka to testify and possibly inflame the passions and prejudices of the jury, and then raise the error on appeal, or attempt to ameliorate the prejudice flowing from the court's ruling by stipulating to the most damaging facts. Counsel, of course, chose the latter route.

Whether defendant preserved for appeal the correctness of the trial court's tentative evidentiary ruling is a close question. We need not resolve the question, however, for assuming the issue is properly before us, we find the trial court's error was harmless. Many of the provisions of the stipulation, such as the victim's physical stature and how long he had worked at the service station, were irrelevant but innocuous. Although several of the stipulated facts concerned the victim's nonviolent, nonaggressive character, defendant never contended otherwise. Two points—a brief description of the victim's religious background and the fact his mother hugged him the

morning of his death—obviously carried the potential to inflame the passions of the jury against defendant. Nevertheless, we cannot say there exists a reasonable probability the result of the guilt phase would have been different had this evidence been excluded. (*People v. Watson, supra*, 46 Cal.2d at p. 836.) Accordingly, we conclude that, assuming defendant preserved the issue for appeal, any error was harmless.

### 5. *Admission of Photographic Evidence*

Over defendant's objection, the trial court allowed the prosecution to introduce into evidence three color photographs of the victim's head and neck, taken before the autopsy but after the body had been cleansed of blood. In addition, a color mug-shot-style photograph of defendant was also introduced. Defendant contends the trial court abused its discretion in so ruling.

This court is often asked to rule on the propriety of the admission of allegedly gruesome photographs. (See, e.g., *People v. Weaver, supra*, 26 Cal.4th at p. 933; *People v. Anderson, supra*, 25 Cal.4th at p. 591.) At base, the applicable rule is simply one of relevance, and the trial court has broad discretion in determining such relevance. (*People v. Scheid* (1997) 16 Cal.4th 1, 13-14 [65 Cal.Rptr.2d 348, 939 P.2d 748].) " '[M]urder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant' " (*People v. Pierce* (1979) 24 Cal.3d 199, 211 [155 Cal.Rptr. 657, 595 P.2d 91], quoting *People v. Long* (1974) 38 Cal.App.3d 680, 689 [113 Cal.Rptr. 530]), and we rely on our trial courts to ensure that relevant, otherwise admissible evidence is not more prejudicial than probative (Evid. Code, § 352). A trial court's decision to admit photographs under Evidence Code section 352 will be upheld on appeal unless the prejudicial effect of such photographs clearly outweighs their probative value. (*People v. Allen, supra*, 42 Cal.3d at p. 1256.) Finally, prosecutors, it must be remembered, are not obliged to prove their case with evidence solely from live witnesses; the jury is entitled to see details of the victims' bodies to determine if the evidence supports the prosecution's theory of the case. (*People v. Scheid, supra*, at p. 16; *People v. Pride* (1992) 3 Cal.4th 195, 243 [10 Cal.Rptr.2d 636, 833 P.2d 643].)

In this case, the prosecutor argued that the three pictures of the victim's neck wounds were relevant to corroborate the prosecution's theory of an execution-style killing, as the wound was clean (indicating the killer had no hesitation) and the victim bore no defensive marks. The prosecutor also argued the photographs corroborated the prosecution's theory that the killer had held the victim's head in his left hand and pulled the knife across the victim's neck with his right hand. The prosecutor also argued that

evidence of the depth of the wound was relevant to whether the wound was intentional.

The photographs in question were relevant, and thus admissible, for all these reasons. From the fact that the killer showed no hesitation and that the victim did not resist, a jury could have inferred that the killer premeditated and deliberated the crime, acted with the intent to kill, and/or lay in wait for his victim.

Defendant argues the information the photographs imparted to the jury was largely cumulative of the pathologist's testimony, which was neither confusing nor complicated. Moreover, he contends the defense never disputed the supposition that the victim did not resist, or that the victim was killed by someone wielding a knife in his right hand. We agree the photographic evidence was not strongly probative of any disputed fact, and that if the photos were inordinately gruesome, this would be a close case on the question of whether the three pre-autopsy photographs were more prejudicial than probative under Evidence Code section 352. (See *People v. Allen, supra,* 42 Cal.3d at pp. 1257-1258 [admission of photographs cumulative to other evidence that "was itself detailed and essentially uncontested" may have been an abuse of discretion, but any error was harmless].) ▉ The fact that the photographic evidence may have been cumulative to other evidence does not render it inadmissible (*People v. Jackson* (1996) 13 Cal.4th 1164, 1216 [56 Cal.Rptr.2d 49, 920 P.2d 1254]), although the trial court should consider that fact when ruling on a motion to exclude evidence pursuant to Evidence Code section 352.

▉ We have examined the photographs and find they are not of such a nature as to overcome the jury's rationality. Moreover, even assuming the court abused its discretion in allowing their admission, no prejudice is apparent. The manner in which the victim was killed was not a contested issue in the case. The only real issue was whether defendant or Garrison was the one who actually used the knife and killed the victim. That issue turned on whether the jury believed defendant or Garrison. The introduction of the photographs in question, even if error, was thus harmless.

Defendant also complains about the admission of a single color mug-shot-style photograph of himself. But this photograph was the one witness McLaughlin had identified as the man he saw at the scene of the crime and was thus relevant to connect defendant to the crime.

▉ Defendant further argues the trial court abused its discretion in admitting at the first penalty phase photographs of stabbing victim Cecelia

Patchett and murder victim Amelda Neff. (See *post*, at pp. 639, 642.) Even assuming defendant is correct and the alleged error improperly convinced some jurors to vote for death over life, the first penalty trial ended in a hung jury. As we recently explained, "[b]ecause we do not know what the first jury would have done had the trial court [excluded the challenged evidence], the only appropriate remedy that could be granted . . . would be to afford defendant a new penalty phase trial free from such purported error." (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1207 [120 Cal.Rptr.2d 477, 47 P.3d 262].) Because defendant has already received that benefit, reversal is not warranted.

To the extent defendant argues that admission of the aforementioned photographs violated his federal constitutional rights to a fair trial, an impartial jury, due process and a reliable penalty determination, we reject those claims because defendant does not explain how the admission of such evidence "was error of a constitutional stature."

### 6. *Pathologist Ferrer's Testimony*

Defendant concedes the information conveyed in pathologist Dr. Jose Ferrer's testimony was admissible, but argues the colorful and allegedly inflammatory manner in which he presented his medical conclusions rendered his testimony more prejudicial than probative in violation of Evidence Code section 352. Thus, Ferrer spoke in terms of blood "spurting" and "oozing" from the victim's neck, that blood "gushed" and "squirted" onto the victim's clothes, resulting in a "pool" of blood on the floor. Because defendant failed to object on this ground at trial, however, he failed to preserve the issue for appeal. His additional claim that counsel were ineffective for failing to object also fails, for the record does not indicate defense counsel's tactics and the matter is not one in which counsel could have no reasonable tactical purpose. (*People v. Mendoza Tello, supra,* 15 Cal.4th at pp. 266-267.) In any event, the probative value of the testimony was high (because it explained the cause and manner of death) and the potential for prejudice was low (because the jury was already aware from other witnesses that the murder was particularly bloody).

### 7. *Closing Argument*

#### a. *Alleged prosecutorial misconduct*

Defendant contends the prosecutor committed misconduct in closing argument in a number of ways, but his chief complaint is that the prosecutor made reference to evidence defendant asserts was inadmissible.

For example, defendant claims the prosecutor emphasized that defense counsel had conceded defendant was guilty of first degree murder and that Elliott Dolinka had acted consistently with his fundamentalist religious views. In addition, defendant notes the prosecutor relied on the pre-autopsy photographs and stressed that defendant had previously killed someone.

We discussed above defendant's claims that the admission of this evidence was improper and found no error. In any event, because the trial court admitted the evidence in question, the prosecutor's reliance on it in his closing argument could not have been misconduct. Defendant's further claim that the prosecutor committed misconduct by mentioning facts not in evidence, such as that the victim was "healthy, happy, normal, and safe," or that defendant "smirked" when police first confronted him with their suspicions about the Dolinka murder, was not preserved for appeal because defendant did not object to either of these statements nor request that the jury be admonished. (*People v. Hill, supra*, 17 Cal.4th at p. 820.)

### b. *Alleged ineffectiveness of counsel*

Defendant next argues that Defense Counsel Vincent O'Malley's closing argument constituted ineffectiveness of counsel. We discussed above the legal standard for such a claim, which encompasses both a deficient performance prong and a prejudice prong. (*Strickland v. Washington, supra*, 466 U.S. at pp. 687-688 [104 S.Ct. at pp. 2064-2065]; *People v. Weaver, supra*, 26 Cal.4th at p. 925.) Defendant attempts to come within this standard by employing such rhetoric as the argument was "without heart or substance," counsel provided no "meaningful arguments," and the argument "eventually disintegrated into a morass of smoke and mirrors." These assertions do not assist the court in deciding whether counsel provided deficient performance.

To the extent defendant presents more substantive arguments, we conclude that, in the context of counsel's entire argument, he did not improperly argue against his client, but simply assessed the evidence honestly,[19] admitting defendant had made some self-serving statements but arguing that Garrison had as well, and that when confronted with the full weight of Garrison's confession, defendant admitted the true level of his complicity,

---

[19]For example, in conceding he could not prove that Garrison was paranoid at the time he confessed, O'Malley was recognizing that no psychiatric expert had examined Garrison on (or near) the day of his confession. O'Malley did state that the defense had presented enough other psychiatric expert evidence from which the jury could infer Garrison was in fact paranoid on that day, that he was afraid police knew he had killed the victim, and that he had confessed so he could cast primary blame on defendant.

namely, that he had participated in the planning and execution of the robbery, but that it was Garrison who had actually killed the victim. In short, we find no ineffectiveness of counsel.

### 8. Insufficient Evidence: Failure to Corroborate Garrison's Accomplice Testimony

 Defendant contends he is entitled to reversal of his conviction due to insufficient evidence. He claims the only evidence of his guilt came from the mouth of Garrison, whose testimony, as an accomplice, was inadmissible absent corroboration. (§ 1111.) We reject the claim because Garrison's testimony is sufficiently corroborated.

Garrison admittedly was an accomplice to defendant's crime, rendering his testimony inadmissible unless corroborated. (§ 1111.) The law, however, requires only slight corroboration, and the evidence need not corroborate the testimony in every particular. (*People v. Williams* (1997) 16 Cal.4th 635, 680-681 [66 Cal.Rptr.2d 573, 941 P.2d 752].) The evidence here more than meets the legal test. Garrison's testimony was amply corroborated by defendant's own extrajudicial statements to police, McLaughlin's identification of defendant, witnesses who observed the Cutlass, the location of the body shop where defendant worked (as verified by police), defendant's tattoo, and the fact that the victim's fatal wounds matched Garrison's description of how the victim was killed. Because there was adequate evidence corroborating Garrison's testimony, its admission was not error and defendant's conviction is thus supported by sufficient evidence.

### 9. Robbery Was Incidental to the Murder

 Defendant next argues the robbery of the victim was incidental to the murder, requiring that we strike the felony-murder special-circumstance finding. Although we have explained that a felony that is merely incidental to the murder cannot serve as the basis for a felony-murder special circumstance (*People v. Green* (1980) 27 Cal.3d 1, 61 [164 Cal.Rptr. 1, 609 P.2d 468]),[20] the facts of this case show robbery was the actors' primary motivation, and the murder was committed to facilitate that crime, i.e., to eliminate the sole witness. Where a criminal has an independent purpose for committing a felony, the *Green* rule is inapplicable. (*People v. Wright* (1990) 52 Cal.3d 367, 417 [276 Cal.Rptr. 731, 802 P.2d 221].) We thus reject the contention that the robbery was incidental to the murder.

---

[20]*People v. Green, supra*, 27 Cal.3d 1, was overruled on another point by *People v. Hall, supra*, 41 Cal.3d at page 834, footnote 3.

### 10. *Reliance on a Lying-in-wait Theory*

■ Defendant next somewhat confusingly argues the penalty judgment must be reversed because his eligibility for the death penalty was based in part on a lying-in-wait special-circumstance finding that was never formally charged and for which he had no notice. Defendant is correct he was never charged with a lying-in-wait special circumstance (§ 190.2, subd. (a)(15)), but he fails to recognize that the jury never sustained such a charge against him. Accordingly, his capital sentence is not based on a lying-in-wait special-circumstance finding.

In his reply brief, defendant recasts his argument, contending he lacked notice that the prosecution intended to rely on a lying-in-wait theory to elevate the homicide to first degree murder. (§ 189 ["All murder which is perpetrated by means of . . . lying in wait . . . is murder of the first degree"].) This argument also is unavailing because the jury returned a hybrid general verdict of guilt of first degree murder that expressly and unanimously sustained the lying-in-wait theory proposed by the People.

When, during a conference with the trial court, it became clear that the court intended both to instruct on and submit hybrid general verdict forms referencing a lying-in-wait theory of first degree murder, defendant objected to the instruction and the verdict forms. At that time, he also "could have moved to reopen the taking of evidence so as to present a defense" against the theory. (*People v. Memro* (1995) 11 Cal.4th 786, 869 [47 Cal.Rptr.2d 219, 905 P.2d 1305] [relating to a felony-murder theory].) By failing to do so, he failed to preserve the issue for appeal. (*Ibid.*)

Assuming the issue is properly before us, we reject the claim. An information or indictment need not specify the theory of murder on which the prosecution will rely; an accused is given sufficient notice of the theory by the evidence adduced in the preliminary examination (or the grand jury proceedings if the People proceed by way of indictment). (*People v. Diaz* (1992) 3 Cal.4th 495, 557 [11 Cal.Rptr.2d 353, 834 P.2d 1171]; *People v. Thomas* (1987) 43 Cal.3d 818, 829, fn. 5 [239 Cal.Rptr. 307, 740 P.2d 419].)

Defendant argues that the rule set forth in *People v. Diaz, supra*, 3 Cal.4th 495, and *People v. Thomas, supra*, 43 Cal.3d 818, does not comport with the Sixth Amendment to the United States Constitution. He relies on *Sheppard v. Rees* (9th Cir. 1989) 909 F.2d 1234. We addressed and distinguished that case in *People v. Gallego* (1990) 52 Cal.3d 115, 189 [276 Cal.Rptr. 679, 802 P.2d 169], explaining that *Sheppard* was an extreme situation in which the defendant was "ambushed" by the prosecution's surprising eleventh-hour

reliance on a felony-murder theory. By contrast, on the facts in *Gallego*, we held the defendant could not have been surprised that the People would proceed on a felony-murder theory.

Here, assuming defendant first learned of the lying-in-wait theory when the parties were discussing appropriate instructions, it was not at that time too late to move to reopen the proceedings to allow the defense to produce evidence addressing the theory. (*People v. Memro, supra,* 11 Cal.4th at p. 869.) Defendant, then, had sufficient time to confront the facts that allegedly supported the theory, eliminating the possibility that any lack of notice was fatally unconstitutional. *Sheppard v. Rees, supra,* 909 F.2d 1234, is thus distinguishable.

 Defendant also argues that the evidence was insufficient to support the jury's finding the lying-in-wait theory was true. The legal standard is a familiar one: "On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560, 572-574, 99 S.Ct. 2781].)" (*People v. Stanley, supra,* 10 Cal.4th at p. 792.)

 To prove lying in wait, the prosecution must prove there was a concealment of purpose, a substantial period of watching and waiting for a favorable or opportune time to act, and that immediately thereafter the defendant launched a surprise attack on an unsuspecting victim from a position of advantage. (*People v. Stanley, supra,* 10 Cal.4th at pp. 795-796; *People v. Hardy* (1992) 2 Cal.4th 86, 163 [5 Cal.Rptr.2d 796, 825 P.2d 781].) The facts, viewed in a light favorable to the People, show Garrison and defendant embarked on a plan to rob the service station, picked a time (early morning) when fewer people would be about, and determined the victim was alone. Garrison dropped defendant off across the street before driving his Cutlass into the station. Garrison paced around the station, helping customers top off their tanks so as to hasten their departures, leaving the victim alone. Garrison engaged the victim in a conversation about fixing the Cutlass, pretending he needed auto repairs. At some point, he and the victim entered the service bay. While Garrison and the victim were talking, defendant entered the area unnoticed, surprised the victim with a headlock from behind, and displayed the knife. After defendant and Garrison obtained the money, defendant killed the victim.

The concealment of defendant and Garrison's deadly purpose was obviously shown by this evidence. That Garrison waited, trying to hurry customers out of the station, and that defendant hung back, waiting for a time to

strike, amply satisfy the requirement of a substantial period of watching and waiting. Once defendant and Garrison were inside the station, the victim had no reason to believe defendant posed a threat to his life, assuming he was aware of defendant's presence at all. Once the victim was surrounded, defendant attacked suddenly from behind. We conclude there was credible and substantial evidence supporting the jury's finding that defendant killed after lying in wait.

To the extent defendant contends the People's reliance on a lying-in-wait theory violated his constitutional rights to due process, confrontation, a fair trial, the effective assistance of counsel, and equal protection, we reject those claims as well.

### 11. *Requiring Special Verdicts*

Defendant contends the trial court improperly acceded to the prosecutor's request to have the jury return special verdicts. With small exceptions, state law requires a jury in a criminal case to return a general verdict (§ 1150), which is defined as a verdict of either "guilty" or "not guilty," "which imports a conviction or acquittal of the offense charged in the accusatory pleading" (§ 1151). This rule ensures that juries have a wide latitude to reach a verdict, permitting them to consider all facets of a case before making a decision. (See generally *People v. Williams* (2001) 25 Cal.4th 441, 450 [106 Cal.Rptr.2d 295, 21 P.3d 1209]; *United States v. Spock* (1st Cir. 1969) 416 F.2d 165, 182.)

In this case, the prosecution proposed to submit to the jury certain verdict forms that would enable the jury to indicate whether it found true any or all of the four proffered theories of first degree murder: premeditated and deliberate murder, murder while lying in wait, felony murder, or murder during the course of a conspiracy. Without stating any grounds, defense counsel objected, but the trial court overruled the objection. The court then instructed the jurors that they need not be unanimous on the theory elevating the homicide to first degree murder so long as they were unanimous that defendant was guilty of that crime. The court further instructed the jurors that "[i]f" they were unanimous on a particular theory, the foreperson should sign and date the corresponding special verdict form, but "[i]f you do not unanimously agree upon any or all of the theories of murder in the first degree, then leave those special findings undated and unsigned." The jury sustained all four special findings.

Contrary to defendant's argument, we have approved the use of such hybrid general verdict forms, finding they do not violate the statutory

prohibition against special verdicts. (*People v. Davis* (1995) 10 Cal.4th 463, 511-512 [41 Cal.Rptr.2d 826, 896 P.2d 119]; *People v. Neely* (1993) 6 Cal.4th 877, 897-898 [26 Cal.Rptr.2d 189, 864 P.2d 460].) Such verdict forms are permissible because they do not ask the jury merely to make factual findings while "ced[ing] the ultimate judgment of [the defendant's] culpability to the trial court." (*People v. Jackson, supra,* 13 Cal.4th at p. 1227.) Defendant's further argument that such hybrid general verdict forms violate his constitutional rights to due process and a jury trial was not preserved for appeal because defense counsel did not make clear their objection was on constitutional grounds. Even assuming for argument that the constitutional issue is properly before us, it is meritless. (*People v. Davis, supra,* at p. 512, fn. 9.)

### 12. *Rushing the Jurors to a Verdict*

At the defense's request, defendant's trial was conducted on a four-day-per-week schedule, with Fridays off. But when closing arguments finished on a Thursday, the trial court inquired whether it would be inconvenient to begin deliberations the next day. The court explained it would instruct the jury at 9:00 a.m., and then the jury would retire to deliberate. The court further explained that the jury would break for the weekend around 4:30 p.m., unless it indicated it was close to concluding its deliberations. Defendant did not object to this procedure. The jury was instructed the next day as indicated and reached a verdict at 2:45 p.m.

■ Defendant contends the trial court improperly rushed the jury to a verdict because, by asking the jurors to come in on their scheduled day off, the court was subtly implying that deliberations would not take very long. Defendant failed to preserve the claim for appeal by objecting at trial. (*People v. Cain, supra,* 10 Cal.4th at p. 55.) Were we to reach the issue, we would find no error. In *People v. Keenan* (1988) 46 Cal.3d 478, 534 [250 Cal.Rptr. 550, 758 P.2d 1081], we explained that "A trial judge should refrain from placing specific time pressure on a deliberating jury and should never imply that the case warrants only desultory deliberation. Such comments risk persuading legitimate dissidents, whatever their views, that the court considers their position unreasonable." The record here fails to support defendant's claim that the trial court pressured the jury or implied that it believed the deliberations would not take long. (See *People v. Anderson* (1990) 52 Cal.3d 453, 469 [276 Cal.Rptr. 356, 801 P.2d 1107].)

### D. *Special Circumstance Issues*

### 1. *Failure to Strike the Prior-murder Special Circumstance*

At the time of his interrogation by police in connection with the Dolinka murder, defendant was already in prison serving a 15-year-to-life term for

the second degree murder of Amelda Neff in 1984 (see discussion *post*, at p. 642). Accordingly, defendant was charged with the special circumstance of having suffered a prior murder conviction. (§ 190.2, subd. (a)(2).) He raises three separate challenges to this special circumstance finding; as we explain, none has merit.

Defendant first contends the prior-murder special-circumstance finding must be set aside because there was no evidence he intended to kill Neff. The claim fails because section 190.2, subdivision (a)(2) does not require the People to prove the prior murder was committed with an intent to kill. (*People v. Neely, supra*, 6 Cal.4th at p. 899; *People v. Hendricks* (1987) 43 Cal.3d 584, 596 [238 Cal.Rptr. 66, 737 P.2d 1350] (*Hendricks*).) Defendant argues that after we held an intent to kill was a necessary prerequisite for felony-murder special-circumstance allegations in *Carlos v. Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], we thereafter held intent to kill was required to sustain the prior-murder special-circumstance allegation. Defendant cites *People v. Turner, supra*, 37 Cal.3d 302, and *People v. Malone* (1985) 165 Cal.App.3d 31 [211 Cal.Rptr. 210] in support, and argues the Neff murder fell within the window period between *Turner* and *Hendricks*, in which an intent to kill was required.

He is mistaken. Neither *People v. Turner, supra*, 37 Cal.3d 302, which involved the multiple-murder special circumstance set forth in section 190.2, subdivision (a)(3), nor *People v. Malone, supra*, 165 Cal.App.3d 31, holds that a prior murder, charged as a special circumstance under section 190.2, subdivision (a)(2), must involve the intent to kill. To the extent there was any confusion in the holding of *Malone* (see, e.g., *People v. Wharton* (1991) 53 Cal.3d 522, 587, fn. 17 [280 Cal.Rptr. 631, 809 P.2d 290]), that case was expressly disapproved on this point in *Hendricks, supra*, 43 Cal.3d at page 596, footnote 3. Accordingly, the prior-murder special circumstance has never required an intent to kill.[21]

Second, defendant contends the prior-murder special-circumstance finding must be reversed because he was not informed, before pleading no contest to the second degree murder of Neff in 1986, that the conviction would make him eligible for the death penalty. The trial court denied his motion to strike the special circumstance on this ground. Defendant argues strenuously that the trial court's ruling was incorrect. We disagree. When a criminal defendant chooses to plead guilty (or, as here, no contest), both the United States Supreme Court and this court have required that the defendant be

---

[21]Because the claim is meritless, we do not address the further claim that defendant failed to object on this precise ground and thus forfeited the issue on appeal.

advised on the record that, by pleading, the defendant forfeits the constitutional rights to a jury trial, to confront and cross-examine the People's witnesses, and to be free from compelled self-incrimination. (*Boykin v. Alabama* (1969) 395 U.S. 238 [89 S.Ct. 1709, 23 L.Ed.2d 274]; *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449].) In addition, this court has required, as a judicially declared rule of state criminal procedure, that a pleading defendant also be advised of the direct consequences of his plea. (*People v. Barella* (1999) 20 Cal.4th 261, 266 [84 Cal.Rptr.2d 248, 975 P.2d 37]; *Bunnell v. Superior Court* (1975) 13 Cal.3d 592, 605 [119 Cal.Rptr. 302, 531 P.2d 1086].) If the consequence is only collateral, no advisement is required.

Defendant cites no authority holding that the future possibility of the death penalty in the event of a second murder prosecution constitutes a direct consequence of a guilty plea.[22] The situation is directly analogous to a claim that a prior serious felony conviction enhancement pursuant to section 667, subdivision (a) cannot be imposed because the defendant had not been advised, prior to pleading in an earlier case, that his conviction could be used to enhance a future sentence should he reoffend. In such cases, the appellate courts have held that the "possible future use of a current conviction is not a direct consequence of the conviction." (*People v. Bernal* (1994) 22 Cal.App.4th 1455, 1457 [27 Cal.Rptr.2d 839]; accord, *People v. Crosby* (1992) 3 Cal.App.4th 1352, 1355 [5 Cal.Rptr.2d 159].)

Although the death penalty is the ultimate punishment in our criminal scheme, in 1986 when defendant pleaded no contest to murdering Amelda Neff his future eligibility for that penalty was only a possible collateral consequence of his plea. Accordingly, failing to advise him of that possibility when he pleaded was not error. The trial court, therefore, did not err in denying his motion to strike the prior-murder special-circumstance finding for the failure to advise him of the possible future use of the conviction to render him eligible for the death penalty.[23]

The third and final reason defendant contends the prior-murder special-circumstance finding must be reversed is because the Neff murder occurred

---

[22]Neither party addresses whether a capital defendant may challenge, either before or during trial, the validity of a prior murder conviction alleged as a special circumstance pursuant to section 190.2, subdivision (a)(2), where the basis of the challenge is not an alleged constitutional deficiency. (Cf. *People v. Horton* (1995) 11 Cal.4th 1068, 1129-1136 [47 Cal.Rptr.2d 516, 906 P.2d 478] [authorizing a challenge that alleges "*fundamental constitutional flaws*" undermining the validity of the prior murder conviction].) Because the People did not object to defendant's motion to strike the prior murder conviction on procedural grounds, we assume without deciding that defendant's challenge to his prior murder conviction was properly raised and preserved for appeal.

[23]Defendant appears to raise another argument why the prior-murder special-circumstance finding cannot stand: he claims his plea in the Neff case must be overturned because he was

after the Dolinka murder and thus was not a "prior" murder. Although the Neff murder, which occurred in 1984, indeed postdated the Dolinka homicide, which was committed in 1982, that fact does not undermine the correctness of the special circumstance finding because, for purposes of the prior-murder special circumstance, "[t]he order of the commission of the homicides is immaterial." (*Hendricks, supra,* 43 Cal.3d at p. 596.)

Defendant argues that *Hendricks* is inconsistent with "federal constitutional principles" and with our Legislature's intent as gleaned through legislative history. Taking the latter point first, defendant argues our interpretation of section 190.2, subdivision (a)(2) renders the word "previously" surplusage in violation of the canons of statutory construction. We addressed and rejected this exact argument in *Hendricks, supra,* 43 Cal.3d at page 595, and defendant does not convince us we should revisit the issue.

Regarding the federal constitutional claim, defendant seemingly contends that considering the 1984 Neff murder as a "prior" murder failed to afford him the fair notice required by the federal due process clause because, at the time he killed Dolinka, he had no way to know "he was subjecting himself to prosecution for a 'prior' murder special circumstance." He cites in support cases suggesting that, in the context of habitual offender statutes, conviction of the first crime gave fair notice that heightened punishment would follow upon reoffense.[24]

We rejected this argument as well in *Hendricks, supra,* 43 Cal.3d 584. We there explained that, in contrast to habitual criminal statutes that seek to punish recidivism, the function of section 190.2, subdivision (a)(2) is to narrow the class of persons eligible for the death penalty. (See also *Zant v. Stephens* (1983) 462 U.S. 862, 878 [103 S.Ct. 2733, 2743, 77 L.Ed.2d 235].)

not advised, before he pleaded, of the range of punishment, i.e., his sentence for second degree murder. The trial court found that, considering the evidence presented, defendant had not been specifically advised that the sentence for the Neff murder would be 15 years to life in prison, but that the sentence had been mentioned in defendant's presence, he knew his sentence would be 15 years to life, and he was not prejudiced by the failure to admonish him formally before accepting his plea.

Because the rule requiring that a trial court advise a pleading defendant of the consequence of his plea is a judicially declared rule of criminal procedure and not a constitutional rule, reversal is not justified unless the pleading defendant demonstrates prejudice. (*People v. Walker* (1991) 54 Cal.3d 1013, 1022-1023 [1 Cal.Rptr.2d 902, 819 P.2d 861].) We agree with the trial court that defendant has not shown prejudice because he was most probably aware of the sentence before pleading in the Neff case; indeed, there is only one prescribed penalty for this type of second degree murder (§ 190, subd. (a)).

[24]In truth, most of the authorities defendant cites in support are not on point, but this is the gist of his argument.

"Unlike recidivism statutes, . . . section 190.2[, subdivision] (a)(2) is directed neither to deterring misconduct nor to fostering rehabilitation." (*Hendricks, supra,* at p. 595.) Because the prior-murder special-circumstance statute is directed to a different purpose than recidivism laws, defendant's attempted analogy is inapt.

Defendant further argues that *Hendricks* is inconsistent with our interpretation of section 190.3, factor (c), which permits a penalty jury to consider—as a capital sentencing factor—prior felony convictions. We held in *People v. Balderas* (1985) 41 Cal.3d 144, 201-203 [222 Cal.Rptr. 184, 711 P.2d 480], that section 190.3, factor (c) is limited to crimes occurring before the charged capital crime. Defendant contends the *Hendricks* court's decision not to impose a similar limit on section 190.2, subdivision (a)(2), the prior-murder special-circumstance statute, was an "abrupt departure from both prior state law and established principles of stare decisis and statutory construction." The break from the past was so great, defendant argues, as to deprive him of federal due process and equal protection. He cites *Hicks v. Oklahoma* (1980) 447 U.S. 343 [100 S.Ct. 2227, 65 L.Ed.2d 175] in support.

We have previously rejected the substance of this contention. As noted, the purpose of the prior-murder special circumstance is to narrow the class of persons who may be given the death penalty, as required by the Eighth Amendment. Accordingly, all murders committed by a defendant, not just those occurring temporally before the present crime, are relevant. By contrast, the "purpose of [section 190.3,] factor (c) is to show the capital offense was the culmination of the defendant's habitual criminality—that it was undeterred by the community's previous criminal sanctions." (*People v. Malone* (1988) 47 Cal.3d 1, 46 [252 Cal.Rptr. 525, 762 P.2d 1249].) In light of this purpose, section 190.3, factor (c) is properly limited to crimes occurring before the present one. Because *Hendricks* thus did not effect an arbitrary denial of a state-created liberty interest, its holding involved no denial of rights that could implicate the holding of *Hicks v. Oklahoma, supra,* 447 U.S. 343.

Defendant further argues that if the prior-murder special circumstance is not limited to murders actually antedating the charged capital crime, then the law is vague and overbroad because it "does not sufficiently guide sentencing juries and channel their discretion in particular cases." Defendant is correct that our statutory special circumstances cannot be overly vague: "Although [United States Supreme Court] precedents do not require the use of aggravating factors, they have not permitted a State in

which aggravating factors are decisive to use factors of vague or imprecise content. A vague aggravating factor employed for the purpose of determining whether a defendant is eligible for the death penalty fails to channel the sentencer's discretion." (*Stringer v. Black* (1992) 503 U.S. 222, 235 [112 S.Ct. 1130, 1139, 117 L.Ed.2d 367].) It is not, however, unconstitutionally vague for the state to determine that one charged with committing first degree murder, who has committed another murder at some other time in his or her life, falls into that narrow category of persons who are more deserving of the death penalty than other murderers. We thus reject the vagueness challenge to section 190.2, subdivision (a)(2). As defendant makes no independent argument as to overbreadth, we reject that claim as well. (*People v. Earp, supra,* 20 Cal.4th at p. 884.)

To the extent defendant contends that applying the rule laid down in *Hendricks, supra,* 43 Cal.3d 584, violated his rights under the ex post facto clause of the federal Constitution because *Hendricks* was decided after he committed the Dolinka murder, we reject that claim. (*People v. Morante* (1999) 20 Cal.4th 403, 430-431 [84 Cal.Rptr.2d 665, 975 P.2d 1071] [ex post facto clause does not apply to judicial decisions].) ▮ We also reject the claim that *Hendricks* constituted an unforeseeable judicial enlargement of the special circumstance statute and that its application to defendant's case violates his right to due process. (See, e.g., *Bouie v. City of Columbia* (1964) 378 U.S. 347, 353 [84 S.Ct. 1697, 1702, 12 L.Ed.2d 894] ["an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law, such as Art. I, § 10, of the Constitution forbids"].) There was no "enlargement" of section 190.2, subdivision (a)(2); indeed, the issue was left open explicitly in *People v. Teron* (1979) 23 Cal.3d 103, 111, footnote 2 [151 Cal.Rptr. 633, 588 P.2d 773],[25] and finally decided in *Hendricks, supra,* 43 Cal.3d 584.

### 2. *Failure to Strike the Felony-murder Special Circumstance*

▮ Defendant demurred to the robbery-murder special-circumstance allegation because the three-year statute of limitations had run on the underlying robbery. (§ 801.) He cited *People v. Superior Court (Jennings)* (1986) 183 Cal.App.3d 636, 641-644 [228 Cal.Rptr. 357] (*Jennings*), in support of his motion, but admitted that this court had expressly disapproved *Jennings* in *People v. Morris* (1988) 46 Cal.3d 1, 18, footnote 7 [249

---

[25]*People v. Teron, supra,* 23 Cal.3d 103, was disapproved on another ground in *People v. Chadd* (1981) 28 Cal.3d 739, 750, footnote 7 [170 Cal.Rptr. 798, 621 P.2d 837].

Cal.Rptr. 119, 756 P.2d 843] (*Morris*).[26] Nevertheless, he argued that *Jennings* had established a judicially created statute of limitations, that *Morris* repealed that rule, and that applying that repeal retroactively to his case violates his right to due process. (*Bouie v. City of Columbia, supra,* 378 U.S. at p. 353 [84 S.Ct. at p. 1702].) The trial court denied the motion.

Defendant renews the argument here, claiming our decision in *Morris* effected an unforeseeable enlargement of a criminal statute and that applying it to his case violated his right to due process. He is mistaken, because the premise of his argument is faulty. *Jennings* did not create a judicially created rule akin to a statute of limitations that was enforceable until overruled by this court. *Jennings* merely was wrong on the law. As we explained in *Morris, supra,* 46 Cal.3d at page 17, "[t]he courts have long permitted felony-murder prosecutions notwithstanding the expiration of the felony statute of limitations for the simple reason that the prosecution is for murder, not for the underlying felony." (Italics omitted.) *Jennings,* then, did not establish a general rule, and *Morris* did not effect an enlargement of a criminal statute, unforeseen or otherwise. We thus reject defendant's due process argument.

## II. Penalty Phase

### A. *Facts*

#### 1. *Aggravating Evidence*

The People presented evidence at the penalty phase retrial indicating defendant was what might be called a "career criminal." Beginning in 1973 when defendant was a teenager, and ending in 1984 (when he killed Amelda Neff), the People's evidence demonstrated that on more than a dozen separate occasions defendant had committed various felonies involving violence. Moreover, incarceration in state prison did not cause defendant to alter his antisocial behavior, for several of his crimes occurred while he was confined in prison. Evidence of his prior felony convictions was admissible pursuant to section 190.3, factor (c) ("In determining the penalty, the trier of fact shall take into account any of the following factors if relevant: [¶] . . . [¶] (c) The presence or absence of any prior felony conviction"). Evidence of prior criminal activity not resulting in a conviction also was admissible in aggravation if it "involved the use or attempted use of force or violence or the express or implied threat to use force or violence." (*Id.,* factor (b).)

In February 1973, defendant was moved from juvenile hall to a group home in Los Angeles called the Lark-Ellen Home for Boys. Although house

---

[26]*People v. Morris, supra,* 46 Cal.3d 1, was disapproved on another ground in *In re Sassounian* (1995) 9 Cal.4th 535, 543-544, footnote 5 [37 Cal.Rptr.2d 446, 887 P.2d 527].

parent Ruth Roberson testified defendant was a "very warm, nice, young, teenage boy," she also testified he told her he was a member of the 18th Street Gang, and she saw him carrying a knife. On February 16, 1973, defendant and two older teenagers attacked a younger boy in the home. When Mary Stacey, a house parent, intervened, defendant pointed his finger at Stacey and stated three times: "I'm going to kill you." Stacey fled. When Steve Fuller, another house parent, arrived at the scene, defendant struck him in the chest. When Fuller restrained defendant, the other two boys joined in the melee, hitting and kicking Fuller. When one of the attackers yelled, "Kill the gringo," defendant replied: "I can't find my knife." When other residents finally separated the boys from Fuller, he was bleeding from his face.

On August 16, 1974, Cecelia Patchett was walking her dog around 11:00 p.m. She saw defendant approaching and speeded up to avoid him. Defendant also speeded up, crossed the street, and asked Patchett repeatedly whether he could pet her dog. She responded in the negative, explaining that her dog bit. Defendant continued to walk alongside Patchett, although by now she was speeding up because she was afraid of defendant. When she turned at the end of the block, defendant seemed to have disappeared, but she suddenly felt a "real hard" blow from behind. She was short of breath, dizzy and cold. She crossed the street and was having trouble breathing. She was hospitalized with eight or nine stab wounds.

Police responded to the scene and, working from a description provided by a witness, located defendant about six blocks away. He had a bloody knife and had blood on his hand. He told one officer he was "sorry" he had stabbed Patchett, but that she had angered him. Defendant was convicted of assault with a deadly weapon.

On August 13, 1978, defendant knocked on the door of Kathleen B., who lived in Oakland next door to a residential reentry program for California Youth Authority parolees. He said he had been in a fight and was kicked out of the program, and he asked for a ride to a friend's house. He had a black eye and a bandage around his head. Kathleen B. agreed, leaving defendant in the front hall while she went upstairs to retrieve her purse and keys. Defendant directed her to downtown Oakland by a circuitous route, eventually stopping in a dead-end street. Defendant demanded money, and she eventually gave him $5. He then produced a knife he had taken from her home and demanded sex, threatening to cut her if she refused. Kathleen B. wrestled the knife away from him, but suffered a cut on her hand and bruises on her head from defendant's blows. Defendant then removed a flashlight from the glove compartment and threatened her with it. She stepped on the gas pedal but had to stop the car because defendant began hitting her on the

head, causing her vision to become blurry when blood ran into her eyes from a cut on her forehead. She eventually complied with defendant's demands that she first manipulate his genitals and then orally copulate him. He then raped her. She complied with his subsequent demand to orally copulate him again.

Kathleen B.'s ordeal finally ended when she pretended to become ill and convinced defendant she would meet him later in a more comfortable setting. When he got out of the car, she drove to a police station and the police took her to a hospital. She then showed police the scene of the crime, and police found defendant in a nearby residence. Defendant admitted to police that he had had sex with the victim. He was convicted of forcible rape and use of the flashlight as a deadly weapon.

On May 16, 1979, defendant was incarcerated at the Correctional Training Facility in Soledad. Correctional Officer Clark observed defendant being very loud, drawing the attention of other inmates, and called his supervisor, Sergeant Rodney Marlin. Marlin ordered defendant to leave the wing with him and then repeated the order. Defendant stood very close to Officer Clark's face and made some intimidating remarks. Marlin testified it was very threatening. Defendant was charged administratively with threatening a correctional officer; he admitted the charge.

On November 16, 1980, Soledad correctional officers discovered that an inmate named Lopez had been beaten up in an area of the prison known as F Wing. An investigation found defendant was present in F Wing without permission. He had blood on his breast pocket and on his pants, and a bruise on his neck. Defendant was charged administratively with assaulting Lopez. He denied the charge, but it was sustained.

On December 29, 1980, defendant—now in San Quentin State Prison—participated in a riot in which inmates caused a dangerous condition inside the prison by flooding their cells, setting fires outside their cells, and throwing things (such as glass, cans, urine and plastic) from their cells. Correctional officers believed the situation was a "very life-threatening situation." Block Sergeant Charles Davenport identified defendant as one of the 10 inmate instigators of the riot and as one of the inmates who had set material on fire outside his cell. Defendant later admitted at a disciplinary hearing to setting fires.

On November 16, 1981, defendant—now in Folsom State Prison—attacked a fellow inmate named David Monday. The victim, who was skilled in martial arts, was working in the metal fabrication shop when he heard

someone yell, "Look out." He turned and saw defendant lunging at him with his right arm. Monday used a martial arts technique to strike defendant in the head with his elbow, rendering defendant unconscious. As defendant fell, Monday heard "some steel" hitting the floor and saw a knife-like implement on the floor next to defendant.

A group of Hispanic inmates (possibly defendant's associates in the Mexican Mafia prison gang) approached Monday armed with various weapons. Monday put his foot on defendant's neck and threatened to harm him if the mob got any closer. This tense situation eventually was defused when another inmate intervened. Housed next to Monday in disciplinary segregation, defendant admitted he had attacked the wrong person, told Monday he had been "high," and said he would straighten the matter out with administrative officials and with the Mexican Mafia. Defendant later told prison officials he had run into a pole.

The crimes against Elliott Dolinka occurred on May 15, 1982. As explained, *ante*, defendant was not apprehended for those crimes until late in 1987, when Mark Garrison contacted the police.

On August 4, 1982, defendant and a man named Villa approached 16-year-old Susanna H. and a female classmate as they were walking around Lake Merritt in Oakland. The men confronted the girls and demanded money. Defendant stood directly in front of Susanna, while Villa held her hips from behind. Meanwhile, the classmate ran away and observed the assault from a distance. Susanna said she did not have any money. The men told her to call her friend back or "I'll fuck you up." Defendant tried to take the victim's necklace, but she pushed his hand away. Susanna was eventually rescued by Suzanne Ray, who was jogging around the lake. She chastised defendant and Villa for bothering the victim and led Susanna away. When Ray looked back, she saw defendant accosting a woman with two children, who fled from the men, running across Lakeshore Avenue and dodging cars to escape.

Defendant and Villa turned their attention to Ambrose Worsley, an elderly man who had been lying down near the lake. Defendant and Villa surrounded Worsley, demanding money. They were harassing him, and he was swatting at them to keep them away. The men suggested they would throw Worsley in the lake. Fortunately, when Ray took Susanna away from the men, she alerted a police officer, who arrested defendant. Defendant later pleaded guilty to misdemeanor attempted grand theft from the person.

On February 12, 1984, 81-year-old Amelda Neff was walking near the corner of Canon Avenue and MacArthur Boulevard in Oakland, carrying her

purse, a newspaper, and a bag of groceries. Defendant approached from the rear, grabbed her purse and ran, apparently escaping in a car driven by Frederick Mangum. Although defendant later denied to police that he had struck the victim, he told Mangum he had struck or "socked" her several times. Mangum noticed defendant's hands were swollen and had a little blood on them. When questioned by the police, defendant accurately described the contents of Neff's purse.

Rickey Brumbaugh discovered Neff, who was unconscious but moaning softly. An ambulance arrived within five minutes, but she did not survive the attack. An autopsy revealed Neff had suffered a fractured hip and several abrasions and contusions. Injuries to her face and both sides of her head, including a significant fracture of the left side of her skull, suggested she had been hit hard several times. Her injuries would not have been caused simply by falling down.

Defendant eventually pleaded no contest to second degree murder. He was serving his term for this crime when officers first questioned him about the Dolinka murder.

Defendant was also identified as the culprit in several purse-snatch-type robberies that occurred within a small area near the Oakland-San Leandro border. Defendant, apparently with Frederick Mangum, would drive around looking for a victim. When one was chosen, Mangum would let defendant out of the car behind the victim and drive on ahead. Defendant would run forward, grab the victim's purse, jump in the car and make his escape. If the victim resisted, he would drag her by the purse straps until she released her purse. No victim suffered serious injury, although some sustained bumps and bruises. All the victims were elderly women who were alone at the time of the attacks.

The robber used this technique on January 29, 1984, against Ingrid Oas; on February 13, 1984, against Kathryn Dudich; on February 20, 1984, against Elsie Collett; and on February 24, 1984, against Settima Corti. Defendant was apprehended after robbing Corti and pleaded guilty to grand theft from the person. All the victims identified the robber in terms matching defendant's general description.

2. *Mitigating Evidence*

Clinical psychologist Mary Ann Kim interviewed defendant and evaluated the effect of his experiences as a child and adolescent. Defendant had an older brother, Louie, and two sisters, Debbie and Virginia. His father abused

alcohol, injected street drugs and contributed to a chaotic and unhealthy family life. From an early age, defendant saw his father beat his mother, Carmen. In one incident, defendant's father held Louie out of a second story window, threatening to drop the child. Defendant's father was eventually sent to prison for drug-related offenses. Defendant's father wanted nothing to do with defendant; Dr. Kim explained that such rejection was a severe form of abuse.

When defendant was five, his mother left him (and his siblings) with her parents and moved to California with a new lover. Defendant's grandparents, who lived in a poor section of Denver, physically abused him. For example, they forced him to kneel on rice kernels for hours and pray. The children also were not allowed to go to the bathroom while they were being punished. Defendant's grandparents also told him his mother was dead. Defendant's grandfather was an alcoholic.

When defendant was seven, he and his siblings were separated and placed in foster care. Defendant and Louie were placed in a home for boys, although they were placed in different buildings. This separation from his brother was very traumatic for defendant. Defendant started acting out, getting drunk and fighting, though he was only nine or 10.

When defendant was about 10, he went to live with the High family as a foster child. The Highs treated defendant like part of their family and, with their encouragement, he played football and piano. He also went camping and skiing. Mr. High testified that defendant was not a behavior problem and described him in very positive terms. After living with the Highs for 14 months, defendant went to visit Louie at the home for boys and found that he had gone to live with their mother in California. Defendant became depressed, and, because he sought to be reunited with his brother and family, the Highs returned him to the home for boys, even though they would have preferred he stay with them.

Unbeknownst to defendant, his sisters had already reunited with their mother and were living with her in California. Defendant soon joined his siblings and mother, as well as Smiley Menzeneres, his new stepfather, and his family. Defendant's mother told defendant several times that she did not like him because he reminded her of his father. She was physically abusive, as was his stepfather. Menzeneres once tried to molest defendant's sister Debbie and pointed a gun at her head when she refused to call him "daddy." Menzeneres, who also abused alcohol, often beat Carmen up; on several occasions, he beat her until she was unconscious. When defendant tried to protect his mother, Menzeneres beat him too. By the time defendant was 14,

he had grown large enough to be a physical threat to his stepfather; as a consequence, Menzeneres began keeping a weapon close at hand. Menzeneres also belittled defendant and his siblings, claiming they ate too much of the food he provided and that he looked forward to when they would leave the home so he could live with Carmen and his own children.

Around this time, defendant began a pattern of antisocial behavior, such as running away from home, missing school, fighting and thievery. His sister Debbie testified he was spending more and more time on the streets. At 14, he was placed in a series of group homes after being declared a ward of the court. At the Lark-Ellen Home for Boys, Ruth Roberson found defendant to be a "good kid," who just fell into the wrong crowd, which then led to alcohol abuse. During the time he lived at the Lark-Ellen home, no one in his family, including his mother, attempted to contact him. Between ages 16 and 17, defendant was placed in a juvenile rehabilitation center. He eventually was sent to the California Youth Authority.

Dr. Kim concluded that defendant had grown up essentially in institutional settings, and his formative years had been "unpredictable." According to Kim, defendant's substance abuse, aggression and antisocial behavior were a direct result of the abuse and neglect he suffered while growing up. His psychological development was impaired by the severe rejection and abuse he had endured, and by the manner in which the adult role models in his life coped with the frustration in their own lives.

Jerry Enomoto, formerly the Director of the Department of Corrections, testified that defendant was considered a management risk in the early 1980's. Defendant had been stabbed in 1983 and again in 1987 by members of the Mexican Mafia for failing to carry out an order to kill someone.[27] Enomoto stated that for a younger inmate to become less violent as he grows older in prison is not unusual. Based on an examination of defendant's prison records, which showed increasing positive remarks over time, Enomoto concluded defendant fit the typical profile of an inmate who becomes less confrontational and violent as he spends more and more time in prison.

Frederick Mangum testified that in late 1983 and early 1984, he saw defendant inject methamphetamine nearly every day.

[27]In rebuttal, the People presented evidence that, as a member of the 18th Street Gang outside of prison, the Mexican Mafia automatically considered defendant a member upon entering prison. In addition to his failure to carry out an order to kill someone, defendant was ejected from the Mexican Mafia when they discovered he was of Native American and not Mexican heritage.

### B. *Penalty Phase Issues*

#### 1. *Issues Concerning the Penalty Phase Retrial*

The jury that found defendant guilty at the guilt phase of the trial eventually deadlocked 10 to two on the appropriate penalty. The trial court declared a mistrial and discharged the jury. At the penalty phase retrial, a newly empanelled jury decided defendant deserved the death penalty. Defendant raises several issues concerning these events. As we recently have explained, alleged errors in the penalty phase of a capital trial that results in a hung jury for inability to reach a unanimous verdict generally cannot result in relief on appeal when the defendant is subsequently given a penalty retrial. (*People v. Slaughter, supra,* 27 Cal.4th at p. 1212.) Because defendant here contends that errors in his first penalty trial improperly contributed to a mistrial and penalty retrial that, he claims, violated his rights under the double jeopardy clause, we proceed to discuss his claims.

#### a. *Constitutionality of penalty retrials*

Defendant first argues that penalty retrials are unconstitutional per se. He reasons juries must view a defendant as cloaked with a presumption of innocence, but a jury empanelled for a retrial of penalty would not do so. Moreover, he contends a jury that had just convicted a defendant of capital crimes would consider as a mitigating factor at the penalty phase any lingering doubts it had of the defendant's guilt, whereas a second penalty jury would not harbor such doubts. He claims use of a different jury to decide questions of guilt and penalty violates his federal constitutional rights to due process, equal protection, a fair trial, and to a reliable and proportional sentence in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. He also claims the penalty retrial violates analogous guarantees in the California Constitution.

That a jury that has just convicted a defendant would view him as cloaked with innocence seems unlikely. In any event, as defendant concedes, we rejected these precise arguments in previous cases. (See, e.g., *People v. Davenport* (1995) 11 Cal.4th 1171, 1192-1194 [47 Cal.Rptr.2d 800, 906 P.2d 1068].) Defendant requests we reconsider our precedents but provides no grounds to do so.

#### b. *Double jeopardy*

Defendant next contends retrial of the penalty phase of this trial violated his rights under both the federal and state constitutional guarantees

against double jeopardy. (U.S. Const., 5th Amend. ["No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb"], 14th Amend.; Cal. Const., art. I, § 15 ["Persons may not twice be put in jeopardy for the same offense"]; see *Benton v. Maryland* (1969) 395 U.S. 784 [89 S.Ct. 2056, 23 L.Ed.2d 707] [federal double jeopardy clause applicable to the states]; see also § 1023.) He concedes a retrial is permitted under both the federal and state Constitutions if the jury is unable to come to a verdict. (See, e.g., *Arizona v. Washington* (1978) 434 U.S. 497, 509 [98 S.Ct. 824, 832, 54 L.Ed.2d 717]; *Green v. United States* (1957) 355 U.S. 184, 188 [78 S.Ct. 221, 223-224, 2 L.Ed.2d 199]; *People v. Fields* (1996) 13 Cal.4th 289, 300 [52 Cal.Rptr.2d 282, 914 P.2d 832]; *Paulson v. Superior Court* (1962) 58 Cal.2d 1, 5 [22 Cal.Rptr. 649, 372 P.2d 641].)

A federal court may declare a mistrial and order a defendant retried if the jury is deadlocked to such a degree that the court believes there is a " 'manifest necessity' " to declare a mistrial. (*Arizona v. Washington, supra,* 434 U.S. at p. 509 [98 S.Ct. at p. 832].) California courts employ a similar rule: a trial court can declare a mistrial if the jury cannot come to a unanimous decision and the court decides there is a "legal necessity" to discharge the jury and start anew. (*People v. Fields, supra,* 13 Cal.4th at p. 300.) Under either standard, a mistrial may be declared if the defendant consents. (*Id.* at pp. 299-300.)

At the threshold, we must address whether defendant preserved this claim for appeal. The general rule is that "former jeopardy [must] be affirmatively pleaded, . . . or any claim on that ground is not preserved for review. (*People v. Belcher* (1974) 11 Cal.3d 91, 96 [113 Cal.Rptr. 1, 520 P.2d 385].)" (*People v. Memro, supra,* 11 Cal.4th at p. 821; *People v. Scott* (1997) 15 Cal.4th 1188, 1201 [65 Cal.Rptr.2d 240, 939 P.2d 354].) Respondent argues defendant failed to so affirmatively plead, once in jeopardy before his penalty retrial, and thus failed to preserve the claim for appeal. We agree and accordingly find the double jeopardy issue is not cognizable on appeal.

Assuming for argument we were to reach the issue, we would conclude there was no violation of defendant's double jeopardy rights because the trial court was well justified in declaring a mistrial. The record shows the jury retired to deliberate on the appropriate penalty at 4:15 p.m. on October 24, 1989, and deliberated until 4:45 p.m. It returned the next day (October 25th) at 9:15 a.m. to continue its deliberations. It broke for lunch at 12:15 p.m., resumed deliberations at 2:00 p.m., and continued until 4:30 p.m.

The jury declared itself at an impasse around 11:00 a.m. the next morning, October 26th, the foreperson stating that the jury was "so far polarized that

[further deliberations] would be an exercise in futility." The trial court offered to reinstruct the jury, or have the reporter read back any testimony, but the foreperson replied, "I don't think that would resolve it." The foreperson noted the vote was 10 to two, and, when asked by the trial court if he "sincerely and truly believe[d] that the jury is in a deadlocked position," he answered in the affirmative.

The trial court decided to poll the jurors. Juror No. 1 agreed with the foreperson, but Juror No. 2 thought further deliberations might be of assistance. The court then directed the jury to resume its deliberations. Outside the jury's presence, Defense Counsel Barnett moved for a mistrial "on the basis that the jury cannot agree." The trial court denied the motion, explaining: "The Court is of the belief that based upon the limited inquiry of basically the three people that were questioned, one of those three certainly felt that further deliberation might be fruitful. As long as that is the opinion of some or a portion of the jurors, the Court is inclined to request that they deliberate and continue their discussions." The jury deliberated the rest of that afternoon.

The jury also deliberated during the morning of Friday, October 27, 1989. After deliberating the morning of October 30th, the foreperson sent a note to the trial court, indicating the jury now unanimously believed it was deadlocked. In court, the foreperson affirmed that the jury was still split 10 to two, and that a reread of testimony or instructions would not further assist the jury. The foreperson stated he believed the jury had "exhausted every possibility [of reaching a unanimous decision]." The court individually polled the jurors and confirmed that they unanimously believed no further deliberations would produce a unanimous verdict. The trial court then declared a mistrial and dismissed the jury.

Section 1140 states: "Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless by consent of both parties, entered upon the minutes, *or unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree*." (Italics added.) Determining whether "there is no reasonable probability that the jury can agree" is committed to the sound discretion of the trial court (*People v. Sandoval* (1992) 4 Cal.4th 155, 195 [14 Cal.Rptr.2d 342, 841 P.2d 862]); on the facts of this case, it does not appear the trial court abused its discretion. The deliberations were not unusually short, and the jurors unanimously affirmed in open court that further deliberations would be fruitless.

c. *Alleged jury coercion*

 Assuming grounds existed for accepting the jury's assertion that it was hopelessly deadlocked, defendant argues the trial court abused its discretion by coercing the jury to reach that conclusion. "The court must exercise its power [in declaring a mistrial] . . . without coercion of the jury, so as to avoid displacing the jury's independent judgment 'in favor of considerations of compromise and expediency.'" (*People v. Breaux* (1991) 1 Cal.4th 281, 319 [3 Cal.Rptr.2d 81, 821 P.2d 585], quoting *People v. Carter* (1968) 68 Cal.2d 810, 817 [69 Cal.Rptr. 297, 442 P.2d 353].) Defendant contends the trial court abused its discretion by improperly encouraging the jury to reach an impasse in three ways: (i) it declined to directly answer a jury inquiry about the consequences of a deadlock; (ii) it declined to permit a readback of defense counsel's closing argument; and (iii) it effectively dissuaded the jury from having a defense witness's testimony reread. As we explain, none of these contentions have merit.

After deliberating just a short time, the jury sent out a note inquiring what consequences would ensue if it could not come to a unanimous decision. After conferring with the parties, the court informed the jury it was not to consider possible consequences of a deadlocked jury as a factor in its decisionmaking process.

As the trial court recognized, we addressed this precise issue in *People v. Belmontes* (1988) 45 Cal.3d 744 [248 Cal.Rptr. 126, 755 P.2d 310], explaining that an instruction setting forth the consequences of a hung jury "would have the potential for unduly confusing and misguiding the jury in their proper role and function in the penalty determination process. Penalty phase juries are presently instructed that their proper task is to decide between a sentence of death and life without the possibility of parole. Any further instruction along the lines suggested herein could well serve to lessen or diminish that obligation in the jurors' eyes." (*Id.* at p. 814.) In short, the trial court did not err by declining to answer the jury's question, and its response to the question could not have improperly influenced the jury to become deadlocked.

The jury also requested a readback of defense counsel's closing argument, particularly the part of counsel's argument where he stated that if any one juror could not vote for death, the defendant would receive a sentence of life

in prison.[28] After conferring with the parties, the trial court[29] informed the jury that "it is not appropriate that the arguments of counsel on either side be reread to the jury."

The trial court did not abuse its discretion. The rehearing of evidence is governed by section 1138.[30] That section "gives a deliberating jury the right to rehear evidence and instruction on request, but does not extend to argument of counsel." (*People v. Pride, supra,* 3 Cal.4th at p. 266.) Moreover, because the jury was interested in a portion of defense counsel's argument that arguably misstated the law, the court was well within its discretion to decline the request for a readback irrespective of section 1138.

Defendant responds that because he has a state and federal constitutional right to present closing argument to the jury (*Herring v. New York* (1975) 422 U.S. 853, 864-865 [95 S.Ct. 2550, 2556-2557, 45 L.Ed.2d 593] [federal right]; *People v. Bonin* (1988) 46 Cal.3d 659, 694 [250 Cal.Rptr. 687, 758 P.2d 1217] [state right]), he has a corollary right to have his jury rehear such argument if it so requests. He suggests that the trial court's failure to permit the jury to rehear counsel's argument violated the Sixth Amendment to the United States Constitution and requires automatic reversal. Because defense counsel was able to make a full closing argument before the jury, defendant's ability to have counsel participate fully and fairly in the factfinding process was not significantly diminished. (*People v. Bonin, supra,* at p. 695.) Accordingly, we find no error, and no coercion of the jury, flowing from the trial court's decision not to allow a readback of counsel's argument.

Third, defendant contends the trial court compounded the above alleged errors by dissuading the jury from following through on its initial request to rehear the testimony of Dr. Mindy Rosenberg, a defense witness who

---

[28]This was an erroneous statement of the law. (See § 190.4, subd. (b) ["If the trier of fact is a jury and has been unable to reach a unanimous verdict as to what the penalty shall be, the court shall dismiss the jury and shall order a new jury impaneled to try the issue as to what the penalty shall be. If such new jury is unable to reach a unanimous verdict as to what the penalty shall be, the court in its discretion shall either order a new jury or impose a punishment of confinement in state prison for a term of life without the possibility of parole"].)

[29]The judge at this point was Judge Thomas Jenkins, substituting for the regular trial judge, Judge Lawrence Stevens, who was absent. Judge Stevens resumed presiding over the trial a day or two later.

[30]Section 1138 provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

provided mitigating evidence in the form of a social science explanation of the influence of defendant's childhood on his later behavior. Defendant's contention does not accurately describe the proceedings below. The record shows the jury sent a note to the trial court indicating Juror No. 6 wished to rehear the testimony of pathologist Dr. Sharon Van Meter, Frederick Mangum, and Dr. Rosenberg. The trial court indicated Dr. Van Meter's testimony took up about 40 pages of the daily transcript, Mangum's testimony only seven pages, but Dr. Rosenberg's testimony took up 180 pages. The court stated: "A`very rough estimate of a time that it.would take to reread that is fairly close to the time that it takes for them to have testified. Dr. Rosenberg was all day. It might be less, but it would be probably three hours, for Dr. Rosenberg's [testimony] approximately. An hour perhaps less for Dr. Van Meter. And not too long for [Mr.] Mangum."

The trial court then asked: "Was there a particular part of any testimony that you were seeking be reread?" Juror No. 6 responded: "On—I guess on the Rosenberg part I was thinking mainly about the whole thing, but certainly I wasn't thinking about the time and [if] no one else objects, I'll withdraw the request for the Rosenberg testimony." The court stated it would make the necessary arrangements for the jury to rehear the testimony of Dr. Van Meter and Frederick Mangum. The court then advised the jury: "[I] [a]sk you to think about, *even including the Dr. Rosenberg one*, whether you—what you do want. . . . You have a right to have *anything* read back that you wish to have read back. And we will make the time and the reporters available." (Italics added.)

As is clear, the trial court did not dissuade the jury from rehearing Dr. Rosenberg's testimony. Instead, it acted reasonably by inquiring whether the juror wished to hear the entire testimony or just some portion of it. The juror then retracted the request. The trial court reiterated that it would allow the jury to rehear any of the testimony, even including Dr. Rosenberg's testimony, if the jury so desired. We find no abuse of discretion, and no coercion of the jury, flowing from the trial court's actions.

In sum, we conclude defendant's penalty retrial was not unconstitutional per se, that he forfeited the double jeopardy claim for appeal by failing to enter such a plea before the second penalty phase, and that even if the issue were properly before this court, the trial court did not abuse its discretion in finding the jury was hopelessly deadlocked and in declaring a mistrial. We further find the court did not improperly coerce the jury's deadlock by refusing to answer the jury's question regarding the consequences of a deadlock, in declining to order a readback of defense counsel's closing argument, or by inquiring whether the jury wished to rehear Dr. Rosenberg's testimony in its entirety.

### 2. Opening Statements

#### a. Alleged prosecutorial misconduct

 Defendant contends the prosecutor committed misconduct in his opening statement at the penalty retrial by informing the jury it would hear evidence that defendant told Garrison he (defendant) had killed previously and would do so again; that the victim was a "normal" 15 year old, who had hugged his mother on the morning he was killed; that defendant was a member of a Hispanic gang intent on killing "gringos"; and that when interviewed by the police, defendant was interested in finding out how little time he could get for his crime. As defendant did not object to any of these comments or request a curative instruction, the claim of misconduct was not preserved for our review. (*People v. Hill, supra,* 17 Cal.4th at p. 820.) Although defendant contends he should be excused from objecting because any objection and request for an admonition would have highlighted the misconduct and exacerbated, rather than cured, the injury, we are unpersuaded, for defendant's proposed rule would excuse an objection in virtually every case. In any event, even assuming the claim of prosecutorial misconduct is properly before us, we perceive no error, for the prosecutor was merely reciting evidence that was properly admissible.

#### b. Alleged ineffectiveness of counsel

 Defendant contends counsel were ineffective in giving their opening remarks at the penalty retrial because they simply told the jury there was no dispute as to the facts of the case and urged the jury to follow the trial court's instructions. Defendant argues this was tantamount to "an unauthorized concession of the ultimate issue to be tried," presumably, that defendant deserved the death penalty. We disagree, because defendant mischaracterizes counsel's opening statement. Mr. Barnett emphasized that the facts of the crime were "horrendously violent," but the jury must decide which penalty, life or death, was appropriate. Counsel then stated in part: "And make no mistake, we're not seeking in any way to excuse this conduct . . . . We will offer it to you in the spirit that in deciding which of these two penalties are appropriate you should take into account the factors that influence a person, how much choice, in essence, they had, how many options they had in the world." As is clear, counsel did not concede "the ultimate issue to be tried." We thus reject the claim that counsel's opening statement was constitutionally ineffective.

### 3. Examination of Garrison

Because much of the evidence presented earlier in the trial was presented again in the penalty retrial, defendant repeats many of the claims we

previously have rejected. Thus, defendant first claims the trial court erred by permitting Garrison to testify despite the terms of his plea bargain. As we explained, this was not error. (*Ante,* at pt. I.C.3.b.) Second, he claims it was error to permit Garrison to testify because he could not identify defendant at trial. Here, too, there was no error. (*Ante,* at pt. I.C.3.a.) Third, he claims it was error to permit Garrison to testify that defendant had told him not to worry because he (defendant) had killed before. Defendant also claims it was error to permit the prosecution to elicit multiple repetitions of the same statement. We previously have explained it was not misconduct for the prosecutor to remark on this statement in his opening (*ante,* at pt. I.C.2.a.) and closing statements (*ante,* at pt. I.C.7.a.), or to permit Sergeant Quinn to testify that Garrison had told him of defendant's statement (*ante,* at pt. I.C.3.e.). To the extent defendant contends the statement was inadmissible hearsay, we reject that claim as well, for the trial court properly ruled it admissible to show defendant's state of mind in forming the plan to commit the robbery and murder. (See also Evid. Code, § 1220 [admission of party excepted from hearsay rule].) Finally, to the extent defendant contends admission of the above evidence violated his constitutional rights to a fair trial, due process, equal protection and a reliable penalty determination, we reject those claims, as the evidence was properly admissible.

### 4. *Failure to Cross-examine Garrison*

 Defendant next argues his defense counsel were constitutionally ineffective for failing to cross-examine Garrison at the penalty phase retrial. He claims cross-examination at the first penalty phase was effective in revealing Garrison's guilt of a previous child molestation, his statement that it was a mistake to allow the victim of that crime to live, and generally to probe and reveal inconsistencies in Garrison's story. Defendant contends that counsel, by choosing not to cross-examine Garrison at the penalty phase retrial, failed to act as a reasonable and diligent advocate. (See *Strickland v. Washington, supra,* 466 U.S. at pp. 687-688 [104 S.Ct. at pp. 2064-2065]; *People v. Weaver, supra,* 26 Cal.4th at p. 925.).

The record suggests a tactical reason for counsel's decision not to cross-examine Garrison. Much of the evidence supporting Garrison's testimony— his unsolicited call to police, his waiver of extradition from Texas, his tour with police showing them relevant locations of the crime, and, most importantly, his November 5th statement to police—was admitted in the guilt phase of trial as a prior consistent statement because the defense had suggested Garrison recently fabricated his testimony so as to comply with the terms of his plea bargain. For the penalty retrial, the trial court ruled this same evidence would not be admissible unless defendant again challenged Garrison's credibility.

Counsel did not state on the record their reasons for declining to cross-examine Garrison (see *People v. Mendoza Tello, supra,* 15 Cal.4th at pp. 266-267), but we may surmise that they concluded defendant was convicted in the guilt phase of the trial despite their challenge to Garrison's credibility. Accordingly, they may have opted for a different strategy in the penalty retrial to exclude the People's proposed evidence that tended to support the truth of Garrison's accusations. This evidence included Sergeant Quinn's testimony reiterating Garrison's confession and accusations against defendant. We cannot say on this record that counsel's tactical decision not to cross-examine Garrison was necessarily unreasonable.

### 5. *Admission of Evidence of Gang Membership*

 Defendant next argues the trial court erred in admitting evidence of defendant's membership in a Hispanic gang, claiming such evidence fanned the flames of racial fear and bigotry in the jury. Specifically, he complains about the following evidence: (i) Ruth Roberson's testimony recounting that, when defendant was living in the Lark-Ellen Home for Boys, he was a member of the 18th Street Gang; (ii) Roberson's testimony that when defendant attacked Steve Fuller in the Lark-Ellen Home for Boys, one of defendant's fellow attackers yelled, "Kill the gringo," and defendant replied, "I can't find my knife"; (iii) testimony from Officer James Gilmartin that the area where defendant stabbed Cecelia Patchett was considered the turf of the 18th Street Gang, and that at the time Patchett was stabbed, the gang had been committing a series of strong-arm robberies on vulnerable people in the neighborhood; and (iv) testimony from David Monday that he had not been the intended victim of defendant's in-prison assault, and that defendant said he would try and straighten the matter out with the people responsible, suggesting such people were members of the Mexican Mafia.

 "Because evidence that a criminal defendant is a member of a juvenile gang may have a 'highly inflammatory impact' on the jury [citation], trial courts should carefully scrutinize such evidence before admitting it." (*People v. Champion, supra,* 9 Cal.4th at p. 922.) Such evidence should not be admitted if only tangentially relevant (*People v. Cox* (1991) 53 Cal.3d 618, 660 [280 Cal.Rptr. 692, 809 P.2d 351]) because of the possibility that the jury "will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged" (*People v. Williams, supra,* 16 Cal.4th at p. 193) or, as relevant here, will jump to the conclusion the defendant deserves the death penalty. (See also *Dawson v. Delaware* (1992) 503 U.S. 159 [112 S.Ct. 1093, 117 L.Ed.2d 309] [evidence of membership in Aryan Brotherhood was not relevant to any disputed fact].)

 Such evidence can, however, be relevant in the penalty phase. Section 190.3 specifically provides that the jury should consider past criminal behavior involving violence or the threat of violence, and we have held

that the prosecution in a capital case properly may divulge to the jury the circumstances of those prior instances of violent criminal activity. (*People v. Scott, supra*, 15 Cal.4th at p. 1218.)

The trial court in this case carefully considered the probative value of the evidence of defendant's gang membership against its potential for prejudice and ruled the evidence admissible. The court did not abuse its discretion by so ruling. Testimony explaining the reasons for the fight at the Lark-Ellen Home for Boys and for the assaults on Patchett and Monday was relevant to show the crimes were "evidently not the product of a personal grievance but of a larger social evil." (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 588 [15 Cal.Rptr.2d 382, 842 P.2d 1142].)

### 6. *Admission of Neff's Prayer Book*

The People proposed to admit evidence that Amelda Neff kept a prayer book in the purse defendant stole. Their proposed evidence showed the book had special meaning for the victim because in it she kept a personal record of all the significant information about her family, such as births and marriages. This information suggests Neff would have been very reluctant to permit a robber to take her purse and supported the People's theory that defendant struck Neff several times in order to convince her to release her purse to him. This evidence also tended to negate defendant's claim that he quickly grabbed the purse and ran, that the victim did not fight back, and that Neff suffered her injuries when she fell.

Defendant objected to admission of evidence about the prayer book, claiming the evidence had limited probative value and essentially constituted prejudicial victim impact testimony. (Evid. Code, § 352.) The trial court overruled the objection. Defendant, reprising these claims, contends the trial court abused its discretion by so ruling. He argues the book had very little relevance and the circumstances of the crime were shown by the testimony of pathologist Dr. Van Meter and the fact that the purse's strap was broken, indicating a great deal of force had been used in extracting the purse from the victim. Moreover, defendant contends the prosecution's true motive was to portray Neff as a pious, religious woman.

We find no abuse of discretion. "Evidence Code section 352 gives the trial court broad discretion when weighing the probative value and prejudicial effect of proffered evidence." (*People v. Champion, supra*, 9 Cal.4th at p. 913.) Certainly the trial court could have excluded the evidence due to its potential for prejudice. But inasmuch as defendant attempted to minimize the seriousness of his participation in Neff's death,

the People were entitled to attempt to show that defendant had punched the victim, thus more directly contributing to her demise. In light of the circumstances, we conclude the trial court did not abuse its broad discretion. To the extent defendant predicates a claim of federal constitutional error on this ruling, that claim likewise must fail.

### 7. *Admission of Photographs*

Defendant again complains about the admission of pre-autopsy photographs of the victim, this time for the penalty-retrial jury to consider. For the same reasons discussed above (*ante*, at pt. I.C.5.), we conclude the trial court did not abuse its discretion.

In addition, defendant argues the trial court abused its discretion in admitting a photograph of Amelda Neff while she was still alive. The photograph was part of a flyer publicizing her murder in an attempt to apprehend her killer, who was then unknown to police. The trial court admitted the flyer with the photograph on it because of its relevance: when the flyer was shown on television, defendant was in the Mangum home, saw the news report, and admitted to those in the room that he had hit Neff several times and was responsible for her death. The relevance of the flyer obviously outweighed any prejudice it had to inflame the jury's passions and prejudices.

### 8. *Pathologist Ferrer's Testimony*

When the day arrived to have pathologist Dr. Ferrer testify, he was ill and the trial court granted the prosecution's motion to have his prior testimony read to the jury. Defendant contends the trial court abused its discretion in so ruling. However, defendant did not object to the procedure; indeed, the record shows he agreed to it. He thus failed to preserve the issue for appeal. (See also *ante*, at pt. I.C.6.)

### 9. *Stipulation as to Mrs. Dolinka's Testimony*

For the penalty retrial, defendant again stipulated to certain facts rather than have the victim's mother testify before the jury. Defendant again contends the trial court's ruling permitting Mrs. Dolinka to testify improperly coerced him into entering the stipulation. As before (*ante*, at pt. I.C.4.), assuming defendant preserved the claim for appeal, we find any error in this regard was harmless. Indeed, the stipulation for the penalty phase retrial was much less extensive than the one agreed to in the guilt phase, and excluded such potentially prejudicial information as the victim's religious views and

that he had hugged his mother before leaving for work.[31] We thus reject defendant's additional claims that admission of the stipulation denied him his federal constitutional rights to a reliable penalty determination, to due process, to equal protection, to a fair trial, and to be free of cruel and unusual punishment.

### 10. *Evidence of Defendant's Suicide Attempt*

Defendant presented evidence in mitigation indicating he was no longer considered a discipline risk in prison. In rebuttal, the prosecution presented evidence that defendant recently had attempted suicide by cutting his wrists with a metal object, which he then swallowed. When this was discovered, prison guards ordered him out of his cell, but he refused, requiring several guards to forcibly restrain him before he could be taken for medical treatment.

Defendant contends the trial court erred by ruling this evidence was admissible, arguing that his attempt to convince the jury to spare his life was severely hampered by evidence he desired to take his own life. "The admission of evidence in rebuttal is a matter left to the sound discretion of the trial court. [Citation.] The court's decision in this regard will not be disturbed on appeal in the absence of 'palpable abuse.'" (*People v. Hart* (1999) 20 Cal.4th 546, 653 [85 Cal.Rptr.2d 132, 976 P.2d 683].) Because the evidence of defendant's suicide attempt and violent rebuff of the orders of prison guards was relevant to rebut his own evidence of his peaceful adjustment in prison, we find the trial court did not abuse its discretion in admitting such evidence. The evidence being admissible, we find no basis for defendant's further claims that admission of this evidence violated his federal constitutional rights to due process, a fair trial, the effective assistance of counsel, and to a reliable penalty determination.

### 11. *Alleged Prosecutorial Misconduct in Closing Argument*

Defendant argues the prosecutor committed misconduct in closing argument in a number of ways. As we explain, we find the claims were not preserved for appeal and that, assuming they were, there was no reversible error.

---

[31]The jury for the penalty phase retrial heard the following stipulation: "That if Rhonda Dolinka were called to the stand, she would testify as follows: That Elliott Dolinka was 15 years old in May of 1981, that he was 6 feet tall, one hundred and 50 pounds, had a slight build, and was not strong. [¶] That Elliott's parents had instructed him to cooperate with any robbery, specifically to follow instructions, to offer no resistance and to give the money to the robbers. Also, that Elliott had never had any instruction in self-defense or the [martial] arts. [¶] And, that on May 15th, 1982, at 6:30 A.M., when he left for work, Elliott had nothing with him or on him which could in any way be used as a weapon."

 "Under state law, a prosecutor who uses deceptive or reprehensible methods to persuade either the court or the jury has committed misconduct, even if such action does not render the trial fundamentally unfair. (*People* v. *Hill, supra,* 17 Cal.4th at p. 819; [citations].) [¶] Nevertheless, as a general rule, to preserve a claim of prosecutorial misconduct, the defense must make a timely objection and request an admonition to cure any harm. The rule applies to capital cases. [Citations.]" (*People v. Frye* (1998) 18 Cal.4th 894, 969 [77 Cal.Rptr.2d 25, 959 P.2d 183].) "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]" (*Id.* at p. 970.)

 The first instance of alleged misconduct occurred at the beginning of the prosecutor's closing argument at the penalty phase retrial. He asked the jury to reflect back to their responses on voir dire when they assured the court they could vote to impose the death penalty if the aggravating factors outweighed the mitigating ones. Defendant contends this argument referred to facts not in evidence (the jurors' individual answers on voir dire) and improperly asked the jury to decide the case "based on their own pretrial predispositions and prejudices, rather than on the law and facts which became known to them during trial." Defendant failed to object on this ground, however, and thus forfeited the claim for appeal. This is not a claim for which a timely objection and request for admonition would have been futile. Defendant contends counsel was ineffective for failing to object, but we disagree: the record fails to show the tactical reasons, if any, counsel may have had. Accordingly, we reject the claim of ineffective counsel, and note that the issue is more properly one for a petition for collateral relief. (*People v. Mendoza Tello, supra,* 15 Cal.4th at pp. 266-267.)

Assuming the issue was preserved for appeal, we find any error was harmless. The People essentially concede the prosecutor argued facts not strictly in evidence, but we agree the argument was not prejudicial. Contrary to defendant's characterization, we find the prosecutor's argument did not exhort the jury to return a death penalty verdict irrespective of the facts. Instead, he merely reminded them of their duty and argued that the facts in aggravation amply justified the ultimate penalty.

 Defendant also contends the prosecutor committed misconduct by arguing that the absence of certain factors in mitigation made them aggravating. (*People v. Davenport* (1985) 41 Cal.3d 247, 289 [221 Cal.Rptr. 794,

710 P.2d 861].) Counsel did not object on this ground, however, thus forfeiting the claim for appeal. (*People v. Frye, supra,* 18 Cal.4th at p. 969.) Assuming for argument the matter was preserved for appeal, we find no misconduct. The record shows the prosecutor merely noted the absence of any evidence to support certain statutory mitigating factors, which is permissible argument. (*People v. Hines* (1997) 15 Cal.4th 997, 1064 [64 Cal.Rptr.2d 594, 938 P.2d 388].) Moreover, the prosecutor actually informed the jury at one point that the absence of evidence for a mitigating factor does not convert it into an aggravating factor. Because the argument was proper, counsel could not have been ineffective for failing to object on this ground.

Defendant also suggests the prosecutor improperly injected his personal opinion into the case. After arguing mitigating factors were missing, the prosecutor stated: ". . . I believe you may find [the absence of mitigating factors] supports the conclusion of the People of the State of California that this was simply an aggravated crime of murder." Defendant argues this was a type of vouching for the justifiability of the People's decision to seek the death penalty, a type of misconduct akin to a prosecutor improperly vouching for the credibility of a witness. (See *People v. Hardy, supra,* 2 Cal.4th at p. 171.) We disagree and find nothing objectionable about the prosecutor's argument.

Defendant next contends the prosecutor committed misconduct by relying on victim impact evidence, noting the victim was an "innocent" 15 year old who was "drowning in his own blood." Defendant did not object to this argument; in any event, it was proper to refer to the circumstances of the crime, which includes the vulnerability of the victim. (*People v. Clark* (1993) 5 Cal.4th 950, 1033 [22 Cal.Rptr.2d 689, 857 P.2d 1099].)

Defendant next contends the prosecutor committed misconduct by referring to a book he called "The Killing of Bob Garland" by a psychiatrist named "Willard Gatlin."[32] The gist of the argument was that in murder cases, the victim quickly ceases to exist in people's minds, and the attention and sympathy that rightly should flow to the victim sometimes becomes perversely focused on the murderer. The prosecutor then asked: "Before you give Raymond Gurule any sympathy, ask how much sympathy he gave to Elliott Dolinka." By this argument, defendant argues the prosecutor improperly relied on expert evidence not admitted at trial.

Defendant did not object and thus failed to preserve the issue for appeal. In any event, we have rejected this precise claim before, involving apparently the same passage from the same book. (*People v. Hines, supra,* 15

---

[32]We assume the prosecutor was referring to The Killing of Bonnie Garland: A Question of Justice by Willard Gaylin (1995).

Cal.4th at p. 1063 & fn. 17; *People v. Rowland* (1992) 4 Cal.4th 238, 277-278 & fn. 17 [14 Cal.Rptr.2d 377, 841 P.2d 897].) Defendant argues those prior cases were incorrect and urges that we reconsider them, claiming that reliance on the book violates his constitutional rights to confrontation, assistance of counsel, and a fair trial. He may be correct to the extent the prosecutor emphasized that the author of the book was a psychiatrist, thereby lending the argument additional scholarly weight. Nevertheless, arguing to the jury the mere idea or belief that criminals sometimes get undeserved sympathy at the expense of their victims was proper, and defendant did not object to the reference to the book author's occupation. We thus find no misconduct.

 Finally, defendant argues the prosecutor's argument was improperly designed to inflame the passions and prejudices of the jury. In support, however, he merely contends the prosecutor should not have relied on various facets of the crime, such as the pre-autopsy photographs, the pool of blood that collected under the victim's body, defendant's membership in a gang, and his statement he previously had killed someone. As before, defendant failed to object to these arguments. Assuming the issue was properly before us, we conclude that, although perhaps damaging to defendant's attempt to convince the jury to spare his life, none of these arguments were improper, as they merely reiterated evidence that had been admitted at trial. In addition, the prosecutor's characterization of defendant as "innately evil" was well within the boundaries of proper argument. (*People v. Hill*, *supra*, 17 Cal.4th at p. 819.) In short, we find no misconduct.

### 12. *Alleged Problems with Penalty Phase Jury Instructions*

#### a. *Rejection of instructions prepared by defense counsel*

 Defendant prepared his own set of instructions for the jury, which he contends were "far more comprehensive and comprehensible" than the standard CALJIC instructions. He argues the trial court erred (and violated his constitutional rights) by rejecting them. We previously have explained that the standard CALJIC penalty phase instructions "are adequate to inform the jurors of their sentencing responsibilities in compliance with federal and state constitutional standards." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1176-1177 [74 Cal.Rptr.2d 121, 954 P.2d 384].) Moreover, the general rule is that a trial court may refuse a proffered instruction if it is an incorrect statement of law, is argumentative, or is duplicative. (*People v. Sanders* (1995) 11 Cal.4th 475, 560 [46 Cal.Rptr.2d 751, 905 P.2d 420].) Instructions should also be refused if they might confuse the jury. (*People v. Hendricks* (1988) 44 Cal.3d 635, 643 [244 Cal.Rptr. 181, 749 P.2d 836].)

Although defendant speaks in terms of the set of proffered instructions as a whole, he identifies only four particular instructions he claims the trial court erred by refusing. First, he complains the trial court should have delivered his proposed instruction that the absence of mitigating evidence could not be considered aggravating. Although this was a correct statement of the law (*People v. Davenport, supra,* 41 Cal.3d at p. 289), it was duplicative of an instruction delivered by the trial court that section 190.3, factors (d) through (k) "can only be considered by you to be mitigating factors" and that factors (a) through (c) of that section "are the only factors that can be considered by you as aggravating factors."

Second, defendant complains about the rejection of his proposed instruction that the jurors need not reach a verdict if they are not unanimous. We agree with respondent that such an instruction could have improperly diminished the jury's duty to deliberate and reach a verdict if possible. (Cf. *People v. Rich* (1988) 45 Cal.3d 1036, 1114-1115 [248 Cal.Rptr. 510, 755 P.2d 960] [instructing the jury on effect of a hung jury "would have diminished the jurors' sense of duty to deliberate"].) Accordingly, we conclude the trial court properly refused that instruction.

Third, defendant's proposed instruction informing the jury that Garrison was an accomplice as a matter of law was duplicative of an instruction the trial court gave.[33] As such, it was properly refused. (*People v. Sanders, supra,* 11 Cal.4th at p. 560.) Fourth, defendant claims he was entitled to a "pinpoint" instruction pertaining to Garrison's status as an accomplice. A criminal defendant has the right to instructions that pinpoint the theory of the defense case. (*People v. Wright* (1988) 45 Cal.3d 1126, 1137 [248 Cal.Rptr. 600, 755 P.2d 1049].) As noted, however, the trial court delivered an instruction informing the jury that Garrison was an accomplice, so an additional pinpoint instruction was unnecessary. In addition, we reject the contention that refusal of this pinpoint instruction violated defendant's constitutional rights.

b. *Double-counting of section 190.3, factors (b) and (c)*

Defendant next claims the trial court's instructions on section 190.3, factors (b) (prior violent criminal activity) and (c) (prior felony convictions) improperly allowed the jury to double-count his prior crimes as aggravating evidence, and that his proffered instructions made it clear such

---

[33]The court instructed: "An accomplice is a person who was subject to prosecution for the crime charged in the information for which Mr. Gurule stands convicted. [¶] In the murder of Elliott Dolinka, the witness Mark Garrison was an accomplice as a matter of law and his statements are subject to the rule requiring corroboration."

double-counting was prohibited. "[T]he standard instructions do not inherently encourage the double counting of aggravating factors" (*People v. Barnett, supra,* 17 Cal.4th at p. 1180), and defendant does not point to anything, such as improper argument by the prosecutor, that might indicate the jury engaged in double-counting. We thus reject the argument that the instructions given were inadequate, as well as the additional argument that failure to deliver counsel's proposed instructions violated defendant's rights under the Eighth Amendment to the United States Constitution.

### c. *Davenport error*

Defendant next contends the instructions failed to inform the jury that the absence of evidence of one of the mitigating factors cannot be considered aggravating. (*People v. Davenport, supra,* 41 Cal.3d 247, 289.) As noted, *ante,* the trial court essentially instructed the jury of this point by explaining that section 190.3, factors (a) through (c) were aggravating only and factors (d) through (k) were mitigating only. We thus perceive no error.

### d. *CALJIC No. 8.88 (1989 rev.)*

■ Defendant contends CALJIC No. 8.88 (1989 rev.) (5th ed. 1988) was defective in four ways.[34] First, it "cuts the jury entirely free of the limited list of aggravating factors enumerated under the controlling statute."

---

[34]CALJIC No. 8.88 (1989 rev.) (5th ed. 1988) stated: "It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on [the] [each] defendant. [¶] After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] An aggravating factor is any fact, condition or event attending the commission of a crime which increases its guilt or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself. A mitigating circumstance is any fact, condition or event which as such, does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty. [¶] The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole. [¶] . . . [¶] You shall now retire and select one of your number to act as foreperson, who will preside over your deliberations. In order to make a determination as to the penalty, all twelve jurors must agree. [¶] Any verdict that you reach must be dated and signed by your foreperson on a form that will be provided and then you shall return with it to this courtroom."

We have previously rejected the notion that the standard instruction defining an aggravating factor encourages juries to consider nonstatutory aggravating factors (*People v. Mincey* (1992) 2 Cal.4th 408, 469-470 [6 Cal.Rptr.2d 822, 827 P.2d 388]), and defendant does not attempt to explain why our prior cases were wrong on this subject.

Second, he contends CALJIC No. 8.88 fails to inform the jury that unless the aggravating factors outweigh the mitigating ones, it cannot impose the death penalty. Third, he attacks the instruction for failing to inform the jury it must return a sentence of life if it finds the mitigating factors outweigh the aggravating ones. We have previously concluded that an instruction failing to make both these points is not impermissible so long as it otherwise adequately informs the jury of its role in weighing the circumstances of the case. (*People v. Kipp* (1998) 18 Cal.4th 349, 381 [75 Cal.Rptr.2d 716, 956 P.2d 1169].) Because CALJIC No. 8.88 (1989 rev.) does so (see fn. 34, *ante*), we reject these claims.

Fourth, defendant contends the "so substantial" language in the instruction is impermissibly vague in violation of his rights under the Eighth Amendment to the United States Constitution. We previously have found this argument meritless, and defendant fails to explain why our prior cases were incorrect. (*People v. Ochoa* (2001) 26 Cal.4th 398, 452 [110 Cal.Rptr.2d 324, 28 P.3d 78]; *People v. Duncan* (1991) 53 Cal.3d 955, 978 [281 Cal.Rptr. 273, 810 P.2d 131].)

13. *Cumulative Impact of Alleged Ineffectiveness of Counsel and Prosecutorial Misconduct*

Defendant contends the cumulative impact of the several instances of alleged ineffectiveness of his defense counsel, coupled with the several instances of alleged prosecutorial misconduct, deprived him of a fair trial. Because we find counsel did not fail to act as diligent advocates, and that the prosecutor did not engage in misconduct, we reject the claim.

14. *Enmund v. Florida*

Defendant contends his case is identical to that in *Enmund v. Florida* (1982) 458 U.S. 782 [102 S.Ct. 3368, 73 L.Ed.2d 1140], where the United States Supreme Court ruled imposition of the death penalty on an offender who did not actually kill or intend to kill, but did participate in the felony, was unconstitutional. Defendant's argument is premised on the success of his arguments that Garrison should not have been allowed to testify, and that his own statements admitting his participation in the robbery should have

been excluded as a violation of *Miranda, supra,* 384 U.S. 436. As explained, *ante,* Garrison was properly permitted to testify, and defendant's statements to police were not violative of *Miranda.* Because there thus was evidence defendant was the actual killer, his situation is demonstrably different from the defendant's in *Enmund.*

### 15. *Proportionality*

 Defendant contends imposition of the death penalty on him is unconstitutional because his culpability is not greater than that of Garrison, who received a sentence of 30 years to life. "We have consistently rejected the contention that intercase proportionality review is required" (*People v. Carrera, supra,* 49 Cal.3d at p. 346), even as to codefendants (*ibid.*; see also *People v. Mincey, supra,* 2 Cal.4th at p. 479). In any event, although Garrison testified at one point that killing the victim was his idea, there was other evidence the killing was defendant's idea, and that defendant personally killed the victim. We assume the jury credited these latter facts, indicating defendant's role in the crime, and thus his culpability, was greater than Garrison's role.

### 16. *The Felony-murder Special Circumstance Adequately Narrows the Class of Persons Eligible for the Death Penalty*

Defendant contends that because, after *People v. Anderson, supra,* 43 Cal.3d 1104, the People can establish a felony-based special circumstance— and thus render a defendant eligible for the death penalty—without proving the defendant intended to kill, the felony-murder special circumstance fails to adequately narrow the class of persons subject to the ultimate penalty as required by the federal Constitution. (See *Zant v. Stephens, supra,* 462 U.S. at p. 877 [103 S.Ct. at p. 2742] [to be constitutional, "an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder"].)

We have rejected this exact claim numerous times (see, e.g., *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1265-1266 [74 Cal.Rptr.2d 212, 954 P.2d 475]), and defendant does not attempt to explain why our prior decisions were incorrect.

### 17. *The Death Penalty Law as a Whole Adequately Narrows the Class of Persons Eligible for the Death Penalty*

Defendant finally contends the death penalty law, as a whole and as applied, fails adequately to narrow eligibility for the death penalty. We have

rejected this exact claim many times in the past (*People v. Weaver, supra,* 26 Cal.4th at p. 992; *People v. Sakarias, supra,* 22 Cal.4th at p. 632) and do so again here.

## CONCLUSION

The judgment is affirmed in its entirety.

George, C. J., Kennard, J., Baxter, J., Chin, J., Brown, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied October 2, 2002.